UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                          )
UNITED STATES OF AMERICA                  )
                                          )
        v.                                )        Criminal No. 10-0298 (PLF)
                                          )
CHARLES IKE EMOR,                         )
                                          )
                Defendant.                )
_____)


OPINION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW

I.  INTRODUCTION

        Charles I. Emor founded SunRise Academy, a private school for special needs

students in the District of Columbia, and ran the school for ten years.  After coming under

investigation for misuse of SunRise funds, he pled guilty in August 2011 to a single count of

wire fraud.  In his plea agreement, Mr. Emor and the United States agreed that the Court would

consider evidence presented by the parties at an evidentiary hearing and then determine the

amount of loss, the amount of restitution owed and the identify of the victim(s), the amount of a

forfeiture money judgment, and whether specific property that had been seized by the

government was subject to criminal forfeiture.  The Court conducted a lengthy evidentiary

hearing on these issues and received pre-hearing and post-hearing briefs from the parties.  The

Court now issues its findings of fact and conclusions of law.


II.  PROCEDURAL BACKGROUND

        On May 18, 2010, the United States obtained seizure warrants from Magistrate

Judge Alan Kay based on probable cause to believe that over $2 million contained in the two

bank accounts held in the name of Core Ventures, LLC, and a 2006 Lexus were proceeds of criminal activity by Mr. Emor and, therefore, subject to forfeiture. See Docket No. 1, 10-266-M-01; Docket No. 1, 10-267-M-01; Docket No. 1, 10-268-M-01.

On November 3, 2010, a federal grand jury returned a 37-count Indictment against Mr. Emor charging wire and mail fraud, theft, money laundering, interstate transportation of stolen property, and D.C. Code theft and fraud violations. See Indictment (Nov. 3, 2010) [Dkt. No. 3]. The Indictment also notified Mr. Emor that the government was seeking forfeiture of the seized funds and vehicle as well as a money judgment. Id.

On August 9, 2011, pursuant to a plea agreement entered under Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, Mr. Emor pled guilty to a Superseding Information charging him with one count of wire fraud under 18 U.S.C. § 1343. See Superseding Information (Jul. 22, 2011) [Dkt. No. 44] ("Sup. Info."). The Information charged that from in or about January 2006 through in or about November 2010, Mr. Emor, "assisted by others, did devise and intend to devise a scheme and artifice to defraud and to obtain money by means of materially false and fraudulent pretenses." Id. at 3. "A goal of the scheme and artifice was for defendant Emor to fraudulently obtain money, from SunRise's bank accounts, for his own use and benefit, and for the use and benefit of his friends and relatives, and to further the scheme by various means, including omissions of material fact, false material pretenses, representations and promises." Id. "It was part of the scheme and artifice that defendant Emor, through various misrepresentations and omission of material facts, used the money obtained from SunRise's bank accounts in a manner unrelated to the education of students with disabilities at SunRise." Id.

The Superseding Information also charged that as part of the scheme, Mr. Emor used a PayPal account to facilitate internet purchases on eBay, and that it was a further part of the scheme for Mr. Emor to cause to be transmitted by means of wire communication the transfer of funds from SunRise's bank accounts to pay for his personal expenditures through his PayPal account. Sup. Info. at 3-4.

The Information contained a forfeiture allegation notifying Mr. Emor that he would be required to forfeit the criminal proceeds of the wire fraud scheme, in the form of a money judgment between $30,000 and $2,470,000 and through forfeiture of specific property, including: (a) $1,810,165.29 seized from BB&T Bank account number #xxxxx9526, held in the name of Core Ventures; (b) $225,141.98 seized from BB&T Bank account number #xxxxx3943, held in the name of Core Ventures; and (c) a 2006 Lexus LX470, registered to Core Ventures. Id. at 4-5.

In his plea agreement, Mr. Emor agreed that the Statement of the Offense, prepared by the government and signed by Mr. Emor, fairly and accurately described his actions and his involvement in the offense to which he pled guilty. Plea Agreement (Jul. 21, 2011) [Dkt. No. 47] ("Plea Agr."), ¶ 4. The Statement of the Offense described Mr. Emor's fraud scheme identically with the count of wire fraud in the Superseding Information, described above. See Statement of the Offense (Aug. 9. 2011) [Dkt. No. 48] ("Stmnt. Offense"), ¶¶ 6-10.

Mr. Emor and the government agreed that the Court would determine the amount of loss under the Sentencing Guidelines. The parties understood that Mr. Emor would argue that the loss amount ranged between $30,000 and $70,000, while the government would argue that the loss amount was $2,470,000, as alleged in the Indictment. Plea Agr. ¶ 6. Mr. Emor agreed to

pay restitution of at least $30,000, with the understanding that the Court would determine the full amount of restitution pursuant to 18 U.S.C. §§ 3663 and 3663A. Id. ¶ 10. Finally, Mr. Emor consented to the forfeiture set forth in the Superseding Information, agreeing to forfeiture of a money judgment of at least $30,000, with the understanding that the government would request a money judgment of $2,470,000 and forfeiture of the property seized from Core Ventures (funds held in two BB&T Bank accounts and a 2006 Lexus LX470). Id. ¶ 11(a). The government understood that Mr. Emor would argue at sentencing that the assets seized from Core Ventures were not derived from any wire fraud scheme and are not properly the subject of forfeiture. Id.

The evidentiary hearing was scheduled to last for three days, but instead stretched over eleven days from September through December 2011. Before the hearing was completed, Mr. Emor proposed that the Court sentence him — pursuant to the terms of the Rule 11(c)(1)(C) plea agreement, under which the parties had agreed to a sentencing range of eight to eighteen months — and make its final determination of the loss, restitution, and forfeiture amounts later, so that he might have the opportunity to benefit from any time already served and so that he could be moved to a federal facility. The government consented. By Memorandum Opinion and Order of October 21, 2011, and based on the evidence it had heard to date, the Court made a preliminary determination that the amount of loss exceeded $200,000 (preliminarily $230,281.40) and calculated Mr. Emor's Guideline sentencing range accordingly — a range that exceeded the agreed upon sentence under the plea agreement. See Memorandum Opinion and Order (Oct. 21, 2011) [Dkt. No. 61] at 3.

On November 10, 2011, the Court sentenced Mr. Emor to eighteen months' incarceration (the maximum permitted under the Rule 11(c)(1)(C) plea agreement) with credit for

4

time already served, and three years of supervised release. <u>See</u> Judgment (Nov. 17, 2011) [Dkt. No. 73], at 2-3. At sentencing, the Court stated that it would impose both restitution and forfeiture but that it needed additional time to determine the identity of the victims, the amount of restitution, the amount of the forfeiture money judgment, and whether the seized properties were subject to forfeiture. <u>See</u> Judgment at 4-5; Preliminary Order of Forfeiture (Nov. 10, 2011) [Dkt. No. 72].

After sentencing, Mr. Emor requested transfer to the Bureau of Prisons and waived his right to be present for the remainder of the evidentiary hearing and the Court's determination of restitution and forfeiture. <u>See</u> Minute Entry (Dec. 19, 2011); Hr'g Tr. (12/19/11) at 17.

## III. FINDINGS OF FACT

As noted, the evidentiary hearing lasted eleven days. The Court admitted over two hundred documents in evidence and heard testimony from eleven witnesses. The following witnesses were called by the government to testify: Jamila Negatu, account specialist for SunRise Academy; John McNair, Jr., Special Agent of the FBI; Paula Travers, former placement specialist monitor for the District of Columbia Public Schools; Amy Maisterra, Interim Assistant Superintendent for the Division of Special Education at the Office of the State Superintendent of Education; Louis Leibowitz, outside accountant for SunRise Academy; and Ryan Clark, former business services representative at LegalZoom, Inc. At least one of these witnesses, Jamila Negatu, was a reluctant witness for the government, testifying under subpoena and with a grant of immunity from prosecution. Hr'g Tr. (9/19/11) at 14-15.

The following witnesses testified on behalf of Mr. Emor: Leonard Ozoemena, former and current member of the SunRise Academy Board of Directors; Erica Monique Hamer, former teacher, program manager, and student welfare coordinator at SunRise Academy; Elena Nicole Viola Roberts, former lead teacher at SunRise Academy; Ava Hughes Booker, former Executive Director of Residential and Interagency Programs for the District of Columbia Public Schools and later outside educational consultant for SunRise Academy; and Esteban Morales, former educational director and current member of the Board of Directors at SunRise Academy.

After carefully considering all of the evidence before it, and making credibility findings as necessary, the Court makes the following findings of fact.

### A. Special Education in the District of Columbia

The Public Education Reform Amendment Act of 2007, effective June 12, 2007, created the District of Columbia's Office of the State Superintendent of Education ("OSSE") and entrusted it with authority over all state special education functions in the District. Since its creation, OSSE has served as the state education agency ("SEA") in the District of Columbia that manages the state-level education functions required by federal and local law. Hr'g Tr. (10/13/11 a.m.) at 50. Before the advent of OSSE, the District of Columbia Public Schools ("DCPS") served as both the SEA and as the local education agency ("LEA"). Id. at 52.

Beginning in 2007, in order for a non-public school to provide special education services to District of Columbia students, a school was required to submit an application and receive a Certificate of Approval from the SEA. Hr'g Tr. (10/13/11 a.m.) at 52. The purpose of

the approval process for non-public schools is to ensure compliance with federal and local education requirements.  Id. at 54.

The District of Columbia is obligated to pay non-public schools for providing special education programs and related services to District of Columbia students placed in its care.  Hr'g Tr. (10/13/11 a.m.) at 51.  Dr. Amy Maisterra, the Interim Assistant Superintendent for Special Education for the District of Columbia, explained:  "The government provides funds to support the implementation of each child's individualized education program or IEP," a requirement of federal law.  Hr'g Tr. (10/13/11 a.m.) at 51; Hr'g Tr. (10/13/11 p.m.) at 37.  An IEP is "a program of services that's created for the [particular] student, that's based on the student's need and their disability as defined in the law."  Hr'g Tr. (10/6/11 a.m.) at 90.

Payments to non-public schools are "for education purposes," specifically "tuition and related services."  Hr'g Tr. (10/13/11 a.m.) at 55.  These payments are comprised of two components: (1) basic tuition; and (2) related services for Medicaid-eligible students based on a student's IEP.  Hr'g Tr. (10/13/11 a.m.) at 54-55, 57-58.  The District of Columbia is reimbursed by the federal government for a portion of the Medicaid-eligible expenses it pays to non-public schools for related services that are provided to special needs students.  See Indictment ¶¶ 9-11.

In January 2009, OSSE assumed responsibility for payment of invoices submitted by non-public schools; before then, DCPS received and processed the monthly invoices.  Hr'g Tr. (10/13/11 a.m.) at 59, 61.  While the methodology used to determine the amount of reimbursement for special education services changed when OSSE assumed payment responsibilities, the invoice payment system and basis for payment of special education were the same during the period that DCPS served as the state education agency.  Id. at 57-58, 61.

When asked about "the expectation in terms of how these funds are used by the schools," Dr. Maisterra testified that the funds are "used for education and related services." Hr'g Tr. (10/13/11 a.m.) at 57-58, 61. She also indicated that fixed costs incurred by a school, such as rent or utility payments, make up part of the cost of the education and related services for which the school is reimbursed: while cautioning that she had not previously thought deeply about the issue, she testified that she believed "expenses that are related to running an educational program . . . would be part of the tuition rate" and properly would come out of the money that is paid to a school pursuant to its invoices. Hr'g Tr. (10/13/11 p.m.) at 69; see id. at 70 ("I would think that . . . any operational costs that support[] the education program could be considered as part of the tuition rate."). Dr. Maisterra testified, however, that she "wouldn't expect" a nonprofit school that receives its funding exclusively from the District of Columbia through the reimbursement program to earn any type of profit. Id. at 70. When asked why, she responded: "Because I guess under the auspices of a nonprofit you wouldn't expect to see a significant profit margin." Id.

### B. SunRise Academy

Mr. Emor founded SunRise Academy in 1999 as a nonprofit corporation under the laws of the District of Columbia. Def. Ex. 3. The Articles of Incorporation for SunRise state that its purpose is "to serve the special needs of students diagnosed as having learning and emotional deficits or disabilities, and needing special education services in the District of Columbia from ages six to twenty-one." Id. The Articles state that the corporation "is organized exclusively for educational purposes," and further provide:

> No part of the net earnings of the corporation shall inure to the
> benefit of, or be distributable to its members, trustees, directors,
> officers, or other private persons, except that the corporation shall
> be authorized and empowered to pay reasonable compensation for
> services rendered and to make payments and distributions in
> furtherance of Section 501(c)(3) purposes.

Id. Nearly identical provisions — limiting SunRise's activities exclusively to educational

purposes, and prohibiting earnings of the corporation from benefitting any private person — were

included in the bylaws ratified by SunRise in April 1999. Def. Ex. 2 at 1, 6.

By 2007 SunRise had over 150 students enrolled in two campuses: the

Intermediate Campus was located at 1501 11th Street NW, and it served male youths aged 7

through 15; the Thurgood Marshall campus was located at 1816 12th Street NW, and it served

male youths aged 14 through 22. SunRise's administrative offices were located at 1130 6th

Street NW. Supers. Info. ¶ 3.

Over the ten years in which Mr. Emor was involved with SunRise, he held several

titles, including President, Executive Director, Founder, and Consultant. Stmnt. Offense ¶ 1;

Gov. Exs. 1, 3, 8, 9-17, 19; Hr'g Tr. (9/19/11) at 25, 41-43.

### C. SunRise's Contract with the District of Columbia

In July 2007, SunRise filed an application with DCPS — which at that time

served as the District's state education agency — for a Certificate of Approval to provide

educational and related services to District of Columbia special needs students as a non-public

school. SunRise's application was approved. Gov. Exs. 1, 2; Hr'g Tr. (9/19/11) at 181-82; Hr'g

Tr. (10/5/11 a.m.) at 32-35; Hr'g Tr. (10/13/11 a.m.) at 52.

SunRise students did not pay any tuition to attend the school, and the only sources of funding for Sunrise during the period relevant to this case were the District of Columbia and the federal government. Stmnt. Offense ¶ 4. Sunrise received payment for the provision of education and related services after it submitted monthly invoices to the state education agency (first DCPS, and later OSSE) "on a reimbursement basis, representing that it had provided special education services to a certain number of qualifying students." Id.; Hr'g Tr. (9/19/11) at 32. SunRise was reimbursed with a flat fee according to the number of students that were enrolled the previous month. Id. at 181-82; Hr'g Tr. (9/20/11) at 137-39; see Gov. Ex. 206. From October 2005 through November 2010, the District of Columbia reimbursed SunRise more than $30 million for special education and related services for District of Columbia students. Stmnt. Offense ¶ 4.

Payments by the District of Columbia to SunRise were comprised of two components: a fixed tuition based on the number of students enrolled and reimbursement for Medicaid-eligible related services that varied based on a particular student's IEP. Hr'g Tr. (9/19/11) at 32-34; Hr'g Tr. (10/13/11 a.m.) at 54-55, 57-58. SunRise submitted monthly invoices for tuition and related services to the District of Columbia for payment, Hr'g Tr. (10/13/11 a.m.) at 64-65, 72; Gov. Ex. 206, and it also submitted monthly forms to the DCPS Medicaid Recovery Unit in order to track Medicaid-reimbursable expenses. Hr'g Tr. (9/19/11) at 32-34; Indictment ¶ 11. The District of Columbia reimbursed SunRise for the educational and related services that the school indicated it had provided. Hr'g Tr. (9/19/11) at 149-50, 181; Gov. Ex. 215. The federal government, in turn, reimbursed the District of Columbia for a portion of the Medicaid-eligible expenses it paid to SunRise. Indictment ¶¶ 9-11.

During the time period covered by Mr. Emor's fraud scheme, the District of Columbia paid SunRise approximately $400,000 to $600,000 per month, based upon the invoices submitted by SunRise. Hr'g Tr. (9/19/11) at 181. These payments were deposited directly into SunRise's bank accounts. Id. at 149; Hr'g Tr. (10/5/11) at 38-39.

### D. The SunRise Board of Directors

Since its incorporation in 1999, SunRise was governed by a Board of Directors (technically a Board of Trustees) comprised of Mr. Emor and other individuals. The Board's membership fluctuated between three and four directors. Def. Exs. 2, 3; Gov. Exs. 9-20. SunRise Board members during the period encompassing Mr. Emor's fraud scheme were Mr. Emor, and, at various times, Chinedu Chukwudozie, Gertrude Edwards (longtime principal of SunRise), Melissa Jean-Baptiste (teacher and vice-principal at SunRise), Faustina Okolo (Mr. Emor's sister), Nicholas Anuforoh (Mr. Emor's college-age son), and Jamila Negatu (SunRise employee and family friend of Mr. Emor). Gov. Exs. 16-20.

During the year 2008, the Board kept no records of any meetings. Gov. Ex. 18. From January 2009 through early 2010 (a critical period in this case), the Board consisted of Mr. Emor, Nicholas Anuforoh and Jamila Negatu. Id.; Def. Ex. 3; Hr'g Tr. (9/19/11) at 46-47.

Ms. Negatu has known Mr. Emor since she was 12 years old. Hr'g Tr. (9/19/11) at 20. Upon completing college in 2006, she was hired by SunRise as an administrative assistant, and her title later changed to account specialist. Id. at 18, 27-28, 41. Ms. Negatu appears to have joined SunRise's Board in December 2008, although no meetings were held that month. Id. at 46, 137-38. At the time she joined the Board, Ms. Negatu had not previously served on a Board

of Directors and was unfamiliar with the type of work that a Board performs. Id. at 137-38.

Mr. Anuforoh, Mr. Emor's son, also appears to have joined SunRise's Board in 2008, and was elected President of the Board in January 2009. Gov. Exs. 18-19. At the time, he was around twenty years old and was enrolled in college at the University of Maryland. Hr'g Tr. (9/19/11) at 47. He also worked part-time doing physical maintenance and IT work for SunRise. Id. at 61.

Ms. Okolo, Mr. Emor's sister, served as a Board member from 1999 to January 2009. Def. Ex. 3; Gov. Exs. 9-18. She recently returned to the Board for a period of time. Hr'g Tr. (12/20/11) at 42-43; Def. Ex. 3.

Ms. Edwards — also known as Makini Niliwaambieni and referred to by SunRise students and staff as "Mama Makini" — served on the Board from 2002 through 2007. Def. Ex. 3. Prior to the establishment of SunRise, Ms. Edwards and Mr. Emor worked together as co-founders of another school, and she was the principal of both SunRise campuses until sometime around 2008. Hr'g Tr. (9/19/11) at 72; Hr'g Tr. (9/20/11) at 109.

In January 2010, just before Mr. Emor reported to prison to serve his sentence for a prior conviction (described below), former SunRise Vice Principal Melissa Jean-Baptiste joined the Board and served until June 2010. Gov. Ex. 20; Def. Ex. 3; Hr'g Tr. (9/19/11) at 140-41; Hr'g Tr. (10/14/11) at 37-38.

Mr. Leonard Ozoemena was an original Board member, serving from 1999 to 2002. Mr. Ozoemena has lived with Ms. Okolo, Mr. Emor's sister, for years. Hr'g Tr. (10/14/11 a.m.) at 35; see Gov. Ex. 5; Def. Ex. 1. Mr. Ozoemena testified that he stopped serving on SunRise's Board in 2002 because he believed that the directors should receive compensation.

Hr'g Tr. (10/14/11 a.m.) at 19.  In June 2010, Mr. Ozoemena returned to the Board and currently serves as Board President.  Id. at 7, 42.  In addition to knowing Mr. Emor through Ms. Okolo, Mr. Ozoemena purchased some of the stolen computers from Mr. Emor that were involved in Mr. Emor's prior criminal case, although he testified that he believed Mr. Emor was legitimately selling the computers.  Id. at 45-47.  Mr. Ozoemena has no direct knowledge of anything with respect to the events at issue in this case, since he was not involved with SunRise from 2002 until June 2010, id. at 19-20, and the Court found his testimony respecting the relationship between SunRise and Core Ventures wholly incredible.  Hr'g Tr. (10/14/11 p.m.) at 50-51.

In December 2011, Esteban Morales, a former educational director at SunRise from 2009-2010, joined the Board.  Hr'g Tr. (12/20/11) at 38.  He was never a director during the period of Mr. Emor's fraud scheme and has no direct knowledge of most of the events at issue.

### E.  Mr. Emor's Prior Conviction

On March 7, 2006, a federal grand jury indicted Mr. Emor in the prior case of United States v. Emor, Criminal No. 06-0064-02 (JR), on charges of conspiracy to commit mail fraud and other offenses.  See Indictment, United States v. Emor, Criminal No. 06-0064-02 (Mar. 7, 2006) [Dkt. No. 1].  In that matter, Mr. Emor was convicted of conspiring with others to steal Gateway computers and resell them.  See Gov. Ex. 163 (Presentence Investigation Report) ¶ 11.  Mr. Emor received multiple shipments of stolen computers from a co-conspirator who worked at Gateway; Mr. Emor had at least two stolen computers shipped to SunRise.  Id. ¶ 13.

On December 21, 2006, a jury found Mr. Emor guilty of conspiracy to commit mail fraud.  Verdict Form, United States v. Emor, Criminal No. 06-0064-02 (Dec. 21, 2006)

[Dkt. No. 37].  Mr. Emor was found accountable for sixty-nine stolen computers, and the loss attributed to Mr. Emor was $138,000.  Gov. Ex. 163 ¶ 17.  On August 16, 2007, Mr. Emor was sentenced to serve a term of incarceration of twelve months and one day and a term of thirty-six months of supervised release.  Gov. Exs. 39, 207.  At sentencing, Mr. Emor — who was born in Nigeria and is not a U.S. citizen — was informed by the Court of his potential deportation as a result of his conviction.  Gov. Ex. 207.  Mr. Emor was released on bond pending appeal.  Order, United States v. Emor, Criminal No. 06-0064-02  (Aug. 30, 2007) [Dkt. No. 76].

On July 17, 2009, the United States Court of Appeals for the District of Columbia Circuit affirmed Mr. Emor's conviction.  Gov. Ex. 40.  On January 7, 2010, the District Court ordered Mr. Emor to report to prison on January 20, 2010.  Gov. Ex. 41; Hr'g Tr. (9/19/11) at 45.

*F.  OSSE Investigation and Revocation of SunRise's Certificate of Approval*

In April 2009, Dr. Richard Nyankori, the Deputy Chancellor for Special Education at DCPS, requested that OSSE conduct an investigation of SunRise "due to our perception that the school has not been fully nor consistently implementing the IEPs of the DCPS students which attend the school at public expense."  Gov. Ex. 209.  The letter noted that "[o]ur initial findings suggest that the school, especially the campus located at the Thurgood Marshall Center, is not operationally stable to meet students' needs nor has it addressed significant student truancy issues."  Id.

Upon receiving Dr. Nyankori's letter, OSSE began conducting an on-site monitoring process at SunRise, which lasted approximately two weeks.  Hr'g Tr. (10/13/11 a.m.) at 77-79.  Dr. Amy Maisterra coordinated OSSE's on-site monitoring process, and visited the

school herself on one occasion.  Id. at 78.  OSSE's monitoring team reviewed the school's facilities, interviewed staff members, parents, and students, and reviewed school records.  Id. at 77.

On May 7, 2010, OSSE issued a report with its investigative findings and revoked SunRise's Certificate of Approval.  The revocation was based on a set of related violations, including failure to keep accurate daily attendance records, failure to fully report absenteeism and truancy, provision of information to OSSE and DCPS "that was false, misleading or, at best, incomplete" regarding student attendance, "[s]ubmission of false student records as a basis for receiving payment from the District for services not actually rendered," along with "false claims" regarding the attendance of one student and "[f]abrication and maintenance of student records for a student which represented him attending more than three months after his transfer to another school."  Gov. Ex. 205 at 1.

OSSE did not base its revocation of SunRise's certificate on any findings related to the quality of education provided at the school.  Gov. Ex. 205 at 1; Hr'g Tr. (10/13/11 a.m.) at 87-88.  While "not making any findings on which it bases a decision" on this matter, the investigative report did state that OSSE "observed conditions that raised significant concerns about the school's ability to provide a Free Appropriate Public Education consistent with federal requirements."  Gov. Ex. at 1; see id. at 11-14 (describing findings on program quality).  Dr. Maisterra testified that the basis for OSSE's revocation was related to findings that were "black and white issues" regarding truancy and attendance records, whereas assessments of SunRise's program quality would require more time and be "more subjective."  Hr'g Tr. (10/13/11 a.m.) at 89.  Dr. Maisterra further explained that OSSE's report reflected great concern regarding the

quality of SunRise's academic program, notably, the lack of curriculum and educational materials available to students.  Id. at 82, 88; Hr'g Tr. (10/13/11 p.m.) at 69; Gov. Ex. 205.  She further testified about the monitoring team's observations regarding a lack of appropriate curriculum materials.  Hr'g Tr. (10/13/11 a.m.) at 83; Gov. Ex. 205.

SunRise did not appeal OSSE's decision to revoke its Certificate of Approval. Hr'g Tr. (10/13/11 a.m.) at 59.

### G.  Mr. Emor's Fraud Scheme

From January 2006 through November 2010, Mr. Emor engaged in a continuing wire fraud scheme, the goal of which was the exploitation of funds provided to SunRise Academy for educational purposes for his personal benefit.  Mr. Emor carried out this fraud scheme through three primary methods.  He used his authority and control over SunRise to use and divert funds from SunRise's bank accounts to enrich himself, his family, and his associates by personally or directing others to: (1) withdraw funds from SunRise's bank accounts by check, wire transfer, or debit/credit card purchases; (2) use SunRise's bank accounts to pay for Mr. Emor's personal PayPal account for purchases made through the online vendor website eBay; and (3) divert $2,087,000 from SunRise's bank accounts to Core Ventures, LLC, a for-profit company formed and owned by Mr. Emor and operated under his exclusive control.  Although his methods varied, Mr. Emor's individual acts are all part of a common scheme to exploit SunRise funds for his personal benefit and thus to defraud the District of Columbia out of money that it paid for the reimbursement of educational services.  The evidence before the Court

conclusively demonstrates that Mr. Emor personally benefitted using all three means of implementing his fraud scheme.

The Court's findings with respect to the three primary methods through which Mr. Emor executed his fraud scheme are described below.

### 1. Direct Use of SunRise Bank Accounts For Mr. Emor's Personal Benefit

The first method of theft comprising Mr. Emor's fraud scheme was his direct withdrawal of funds from SunRise's bank accounts by check, wire transfer, or debit/credit card purchase. The Court finds that Mr. Emor obtained $178,076.08 from SunRise's bank accounts to pay for personal expenditures, including support of his children and female companions, jewelry, clothing, liquor, vehicles, custom tailoring, and dating services. See Gov. Exs. 45-46, 61, 74-76, 78-79, 88-90, 92-94, 98-99, 100, 143-62, 202-03.

#### a. Payments for Personal Purchases

Mr. Emor used a debit/credit card that drew directly from SunRise's bank accounts to purchase $11,362.94 of personal items, including alcohol, retail goods, and retail and custom-tailored clothing. Hr'g Tr. (10/5/11 p.m.) at 11-13; Gov. Exs. 143-62, 204A.

In addition, in January 2010, Mr. Emor directed Ms. Negatu to wire money to his commissary account at the prison in which he was incarcerated. The total amount for those two wire transfers, which were made from SunRise's bank accounts, was $1,050. Gov. Exs. 89, 90; Hr'g Tr. (9/19/11) at 82-84. At the time of these transfers, Ms. Negatu had full power of attorney over Mr. Emor's personal bank account, but she used SunRise's funds instead; she testified that Mr. Emor had told her to wire the money from the SunRise account. Id. at 83, 152-53.

b.  Payments to Benefit Family Members and Associates

In addition to purchasing items for his own use, Mr. Emor caused SunRise funds to be spent for the benefit of his family members and associates.

Between December 2009 and June 2010, Mr. Emor directed Ms. Negatu to make rent and utility payments out of SunRise's bank accounts on behalf of Becky Coker, the mother of three of Mr. Emor's children, totaling $13,217.70.  Gov. Exs. 92, 93, 94, 204A; Hr'g Tr. (9/19/11) at 73-77, 86-92.  In addition, SunRise's records show a February 24, 2009 check in the amount of $6,100 made payable to Louise Pierson that was for Ms. Coker's rent.  Gov. Exs. 78, 204A, Hr'g Tr. (10/5/11) at 48-49.  SunRise also paid for Ms. Coker's monthly Verizon Fios bills and provided her with two cars.  Gov. Ex. 94, Hr'g Tr. (9/19/11) at 155-56.  At Mr. Emor's request, SunRise's Board approved using SunRise's funds for Ms. Coker's rent and utility payments.  Gov. Ex. 19;  Hr'g Tr. (9/19/11) at 77-78, 186.  Ms. Negatu explained the Board's actions by stating that "[it] kind of make[s] sense providing service to the family . . . since she is the mother of his child and he's a founder of the school[.]"  Hr'g Tr. (9/19/11) at 77.

At Mr. Emor's request, Ms. Negatu wrote a $2,500 check from SunRise's bank accounts to Rene Isaacs — the mother of another of Mr. Emor's children, because "she needed help with their child."  Hr'g Tr. (9/19/11) at 78-79; Gov. Ex. 88.

On or about March 11, 2009, Mr. Emor signed a $1,000 handwritten check drawn on one of SunRise's bank accounts made payable to Aissata Traore, who appears to be the mother of one of Mr. Emor's children; the memo line reads for "support services."  Gov. Ex. 79.[1]

---

[1]    The government's only witness who testified regarding this transaction, Ms. Negatu, did not recognize the name "Aissata Traore" when counsel showed her the check in question.  In response to further questioning about whether she knew who this person was, Ms.

Several checks were drawn upon SunRise's bank accounts and made payable to Mr. Emor's adult son, Nicholas Anuforoh, which were unrelated to Mr. Anuforoh's seasonal employment at SunRise. Specifically, Mr. Anuforoh received a July 28, 2006 check for $1,500; the memo line of the check states "gift." Gov. Ex. 74. Similarly, on or about August 13, 2008, Mr. Emor drew upon SunRise's Wachovia bank account, writing two handwritten checks to his son in the amounts of $2,505 and $3,005, with memo lines reading "program Svcs"; these checks were in addition to Mr. Anuforah's paycheck for the pay period ending on August 22, 2008. Gov. Ex. 75; Hr'g Tr. (9/19/11) at 108-11.

Mr. Emor also directed that two checks (dated June 16, 2008 and December 9, 2008 in the amounts of $1,952.79 and $1,324.58, respectively) be issued to the University of Maryland in payment of Mr. Anuforoh's college tuition. Gov. Ex. 76; Hr'g Tr. (9/19/11) at 99-100. Ms. Negatu acknowledged that Mr. Anuforoh's seasonal work in SunRise's maintenance and IT departments should not have qualified him to receive tuition payment benefits. Hr'g Tr. (9/19/11) at 100.

c. Payments for Vehicles and Related Expenses

Mr. Emor used funds totaling $119,910.07 from SunRise's bank accounts to purchase, register, and maintain a number of vehicles that were unrelated to SunRise's mission as a special education school and that were driven exclusively by Mr. Emor.

---

Negatu explained that she knows of a woman with whom Mr. Emor has a child besides those previously discussed and that this person is named something like "Aisha," although Ms. Negatu does not know her last name or how her first name is spelled. Hr'g Tr. (9/19/11) at 114-17. In light of the evidence presented to the Court, and given Mr. Emor's failure to offer any evidence to the contrary, the Court finds that Aissata Traore is in fact the "Aisha" known by Ms. Negatu as the mother of one of Mr. Emor's children.

Ms. Negatu testified regarding Mr. Emor's direct use of SunRise's bank accounts to purchase, insure, maintain, and repair multiple automobiles, of which he was the sole user. Hr'g Tr. (9/20/11) at 93-97; see Gov Ex. 204A. Specifically, in April 2008, Mr. Emor purchased a Mercedes GL SUV for $47,500. Gov. Ex. 99. In July 2008, Mr. Emor purchased an Infiniti G35 for $16,000. Gov. Ex. 98. In September 2008, Mr. Emor purchased a convertible Mini Cooper for $31,700. Gov Ex. 100; Hr'g Tr. (9/20/11) at 93-96. These vehicles were purchased using funds from SunRise's bank accounts and were initially registered in SunRise's name. Gov. Ex. 61 (automobile titles); Hr'g Tr. (9/20/11) at 55-58, 60. The vehicles were never used by other SunRise staff or for educational purposes. Hr'g Tr. (9/20/11) at 73-77; Hr'g Tr. (10/14/11 p.m.) at 100; Hr'g Tr. (12/19/11) at 136. In January 2010, shortly before Mr. Emor reported to prison to serve the sentence for his prior conviction, he ordered these vehicles and others to be stored on blocks in a shed on the grounds of "Edgemeade," a former school located in Maryland and owned by SunRise. Hr'g Tr. (9/20/11) at 48, 73-77; Hr'g Tr. (10/5/11 p.m.) at 8-9.

In May 2009, Mr. Emor ordered the transfer of the titles for the Mercedes, the Mini Cooper, and the Infiniti from SunRise to Core Ventures, the for-profit LLC created and owned by Mr. Emor. Hr'g Tr. (9/20/11) at 54-60, 68-70; see Gov. Exs. 61, 66. In addition, Mr. Emor caused the title transfer taxes and fees to be paid from SunRise's bank accounts, not Core Ventures' bank accounts. Hr'g Tr. (9/20/11) at 63-64, 67. Core Ventures did not provide any compensation to SunRise Academy for the vehicles. Hr'g Tr. (9/20/11) at 64; Gov. Exs. 61, 64-65, 102-03.

Mr. Emor told Ms. Negatu that he bought these vehicles to sell them for a profit. Hr'g Tr. (9/20/11) at 25, 59. But at the time Mr. Emor reported to prison in January 2010, at

which point he ordered the vehicles stored on blocks and well over a year after the vehicles were purchased, none of the cars had ever been listed for sale. Id. at 59-60. All told, Mr. Emor used $24,710.07 of funds from SunRise's bank accounts for vehicle-related ownership and maintenance costs, including title transfers, in addition to the $95,200 that he spent on the purchase of the three vehicles. Gov. Exs. 61, 64-65, 102-09, 113-14, 198-99.

### d. Sale of SunRise-Owned Property for Personal Benefit

In November 2008, Mr. Emor sold a SunRise-owned 2003 Volvo XC90 for $12,000. Instead of depositing the money from the sale into SunRise's bank account, Mr. Emor deposited it into his own personal account. Gov Exs. 61, 101; Hr'g Tr. (9/20/11) at 62.

### e. Payment to Incorporate Core Ventures

Mr. Emor used a debit card attached to SunRise's bank account to pay $648 to the online legal service provider LegalZoom, Inc. ("LegalZoom") for the incorporation of Core Ventures, LLC. Hr'g Tr. (10/5/11 p.m.) at 23; Gov. Exs. 45, 46, 212.

### 2. Mr. Emor's Personal PayPal Account and His eBay Purchases

Mr. Emor also exploited funds from SunRise's bank accounts for his own benefit by having SunRise pay for his personal PayPal account. Hr'g Tr. (10/15/11 a.m.) at 39-89; Hr'g Tr. (10/5/11 p.m.) at 2-13. Mr. Emor used his PayPal account to purchase thousands of dollars' worth of merchandise from eBay. See Gov. Ex. 115. Because some of the merchandise could have been purchased either for personal use or for school-related purposes, the government excluded from the Court's consideration, among other items, electronic equipment, computer

equipment, food purchases, restaurant bills, and certain retail clothing, because "they possibly could be school expenses." Hr'g Tr. (10/5/11 a.m.) at 45; see id. at 44-47.

Mr. Emor provided gifts, such as inexpensive watches, cufflinks and gift baskets, to staff members during at least one holiday party. Hr'g Tr. (10/14/11 p.m.) at 97; Hr'g Tr. (10/6/11 a.m.) at 32-37, 42. The Court therefore has excluded from its loss, restitution, and forfeiture calculations all watches, cufflinks, and jewelry that cost less than $150, along with certain other items that might have been gifts to staff or students. See Memorandum Opinion and Order (Oct. 21, 2011) [Dkt. No. 61].

The Court finds that Mr. Emor obtained for his personal use $94,108.32 worth of expensive watches, jewelry, cufflinks, clothing, shoes and boots, dating services, personal entertainment videos, and other items through PayPal and eBay purchases. Hr'g Tr. (10/5/11 a.m.) at 39-89; Hr'g Tr. (10/5/11 p.m.) at 2-13; Gov. Exs. 115-41, 204A. Specifically, Mr. Emor spent the following: $71,008.91 on watches, $8,214.75 on jewelry, $6,721.74 on cufflinks, $4,436.44 on clothing, $1,911.53 on boots and shoes, $444.63 on dating services, $70.46 on personal entertainment videos, and $1,299.86 on miscellaneous items. During the three months before he reported to prison in January 2010 to serve the sentence for his conspiracy conviction, Mr. Emor spent over $50,000 on seven watches. Gov. Ex. 204A.

### 3. Monetary Transfers to Core Ventures

The Court finds that Mr. Emor used Core Ventures as another means of implementing his fraud scheme, and that the monetary transfers of $2,087,000 from SunRise to Core Ventures were part of that scheme.

Mr. Emor maintains that Core Ventures is a for-profit corporate affiliate of SunRise, that SunRise owns Core Ventures, that the transfers of funds from SunRise to Core Ventures were legitimate business loans, and that these loans were designed to provide start-up funds for a coffee shop and vocational school to be operated by Core Ventures that would earn profits to help fund SunRise in the face of declining revenue from the District of Columbia. See Mr. Emor's Post-Hearing Sentencing Brief ("Emor Br.") [Dkt. No. 92] at 12-17. The Court does not find these claims credible. While the record shows that Mr. Emor made similar claims about Core Ventures' purpose to SunRise's Board of Directors and to others, the evidence before the Court indicates that Core Ventures is owned exclusively by Mr. Emor, that it has no formal affiliation with SunRise, that the transfers of funds to Core Ventures were not accompanied by any loan documentation, that Core Ventures never engaged in any of the activities it was purportedly formed to carry out, and that the few transactions in which the company did engage were unrelated to those activities and had the effect of personally benefitting Mr. Emor and placing large amounts of money within his exclusive control.

a. Formation and Ownership of Core Ventures

In June 2008 Mr. Emor formed Core Ventures, a for-profit limited liability company, through the online legal services provider LegalZoom. Gov. Exs. 46, 212, 223. Mr. Emor provided all of the information utilized by LegalZoom in its preparation of the incorporation documents. Hr'g Tr. (12/21/11) at 10, 30-31.

An Operating Agreement for Core Ventures introduced by the government lists Charles Emor as the sole initial member of the company. The Operating Agreement states that

23

Mr. Emor provided a $100,000 capital contribution and owns a one hundred percent interest in the company. Gov. Ex. 212. The document also lists only Charles Emor as a signatory. Id.[2]

Ryan Clark, a former employee of LegalZoom, testified that he processed Mr. Emor's service request and took information from Mr. Emor over the phone about Core Ventures on June 6, 2008. Mr. Clark took contemporaneous notes, which were entered into LegalZoom's computer system. Hr'g Tr. (12/21/11) at 8, 11; Gov. Exs. 45, 212, 223. According to Mr. Clark's notes, Mr. Emor stated that he was the only contributor to Core Ventures, that he owned one hundred percent of the business, and that he had made a capital contribution of $100,000. In the evidentiary hearing, Mr. Clark explained: "That means that the hundred thousand dollars was coming from the person who was forming the business, which was Charles Emor [and that] he has not allocated the ownership of his company to anyone but himself." Hr'g Tr. (12/21/11) at 13-14. These notes and Mr. Clark's explanation of them are consistent with the certified business records subsequently produced by LegalZoom. Gov. Exs. 45, 212, 223. But there is no evidence that any of Mr. Emor's personal funds were used to capitalize Core Ventures. Gov. Exs. 48-50. Rather, as both parties acknowledge, all Core Ventures' funds came from SunRise.

In the incorporation documents for Core Ventures, Mr. Emor listed SunRise's address as Core Ventures' business location. Hr'g Tr. (9/20/11) at 70-71; Gov. Exs. 46, 212,

---

[2]     The copy of the Operating Agreement provided by the government, which was apparently supplied by LegalZoom, is not signed or dated. Gov. Ex. 212. Mr. Emor avers that this fact "can only mean that Mr. Emor did not consider himself the owner of Core Ventures. Notwithstanding what might be on the document and what he might have said to Mr. Clark at LegalZoom." Emor Br. at 28 n.29. The Court does not accept the inevitability of this implication. And while the Court has taken the lack of a signature into account in weighing the significance of this document, it has also taken into account Mr. Emor's failure to supply any documentation whatsoever showing that Core Ventures is owned by anyone besides Mr. Emor.

223. In addition, records kept with BB&T bank and papers filed with the District of Columbia provided SunRise's address as that for Core Ventures. Gov. Exs. 44, 48-49. For at least one purpose, however, Mr. Emor used an address on North Capital St. NE, Washington, D.C., as Core Ventures' address. See Gov. Ex. 67 (automobile insurance paperwork for vehicles titled in Core Ventures' name). This address was a townhouse owned by SunRise and used by Mr. Emor as his personal residence, and it was Mr. Emor who directed that this address be used. Hr'g Tr. (9/20/11) at 70-71.

The parties in this case have sharply contested who owns Core Ventures. Mr. Emor urges the Court to conclude that SunRise owns Core Ventures. No documentation supports this claim, however, and the evidence before the Court indicates that Mr. Emor is the sole owner of the company. As described above, the Operating Agreement produced for Core by LegalZoom names Mr. Emor as the sole member, owning a one hundred percent interest in the company. Mr. Clark's database notes indicate that this information was conveyed to him by Mr. Emor himself. An application for reinstatement of LLC status filed by Core Ventures, in January 2010, is signed by Mr. Emor and designates him as the member executing the form. Gov. Ex. 43. None of Core Ventures' incorporation or other documents, including the Articles of Incorporation filed with the District of Columbia, mentions any other member besides Mr. Emor or refers to SunRise in any manner. Gov. Exs. 42-45, 212, 223. Although the documentary record is slim, it tells a consistent story: that Charles Emor formed Core Ventures and is the sole owner.

In attempting to rebut this conclusion, Mr. Emor offers no documentation to the contrary but instead relies on testimony that ultimately derives entirely from his own

representations. To that end, Mr. Emor highlights the testimony of Ms. Negatu, "[t]he only person who testified with actual knowledge of the ownership of Core Ventures." Emor Br. at 26. Ms. Negatu's testimony makes abundantly clear, however, that she had no independent knowledge of who owned Core Ventures other than what Mr. Emor told her. When asked by the Court whether she had ever seen any document indicating that SunRise owned Core Ventures, Ms. Negatu testified, "I believe we filled out some document regarding the member of Core Venture[s]," and that "I think SunRise was going to own Core Venture[s]," but she could cite no supporting documents. Hr'g Tr. (9/26/11) at 44, 48. In response to a government subpoena for all documents relating to Core Ventures, SunRise provided only minutes from two Board of Directors meetings (discussed below). Hr'g Tr. (10/5/11 p.m.) at 33-34; Gov. Exs. 19, 193-94. Ms. Negatu's belief that Core Ventures was owned by SunRise was predicated in part on her understanding that the members of an LLC are like the board of directors of a corporation — rather than individuals with an ownership interest in the company — and that the individuals comprising SunRise's Board of Directors therefore were members of Core Ventures because they also ran Core Ventures. Hr'g Tr. (9/26/11) at 43-44.

Mr. Emor also points to tax documents prepared for SunRise by Louis Leibowitz, SunRise's outside accountant, which purportedly imply that Mr. Leibowitz "clearly did not consider Mr. Emor the owner of Sunrise." Emor Br. at 92 at 28. The Court does not believe that this implication follows from the documents. More important, as discussed below, Mr. Leibowitz also lacked any independent knowledge of who owned Core Ventures, see Hr'g Tr. (10/18/11 p.m.) at 74-75, and he testified before this Court that he has "never been able to determine" the answer to that question. Id. at 27. Mr. Emor's arguments regarding the

ownership of Core Ventures amount to little more than sophistry: the record before the Court

indicates unequivocally that he, and he alone, owns the company.[3]

b. Transfer of Funds from SunRise to Core Ventures

Beginning in March 2009, in a series of wire transactions, Ms. Negatu, at Mr.

Emor's direction, transferred $2,087,000 from SunRise's bank accounts to Core Ventures' bank

accounts. Hr'g Tr. (9/20/11) at 17-18; Gov. Exs. 52, 53, 56, 57, 58, 59, 204A. Mr. Emor

approved and directed each transaction. Hr'g Tr. (9/20/11) at 18. Indeed, Ms. Negatu testified

that it was Mr. Emor who determined that $2 million was the proper amount to transfer to Core

Ventures from SunRise, and that he decided the amount of each transfer based on how much

"extra" money was available after SunRise's most recent payments by the District of Columbia.

Id. at 17-19.

On March 9, 2009, Mr. Emor opened a bank account in the name of Core

Ventures at BB&T, account no. xxxxx9526. Mr. Emor was the sole signatory on the account.

Hr'g Tr. (9/20/11) at 9; Gov Ex. 48. This Core Ventures account was initially funded by a

$100,000 in-branch wire transfer from one of SunRise's bank accounts. Hr'g Tr. (9/20/11) at

---

[3]     The Court is not persuaded that Mr. Emor's designation of himself as the sole
member and capital contributor of Core Ventures resulted from his lack of legal training or the
fact that he set up Core Ventures "through a low cost mechanism" by utilizing LegalZoom. See
Emor Br. at 38. Had Mr. Emor wished to establish Core Ventures as an affiliate of SunRise or to
create proper documentation for the purported loans from SunRise to Core Ventures (described
below), he could have hired a lawyer — indeed he already had persuaded SunRise to pay his
personal legal bills for the appeal of his prior criminal conviction. Moreover, as the government
notes, "providing the name of a corporation's owner's or member's name when asked on a
computer form or by the incorporator's representative or when drafting the Articles of
Incorporation does not take any sophisticated legal knowledge." Government's Reply to
Defendant's Post-Hearing Sentencing Brief [Dkt. No. 95] at 15.

13-14; Gov. Exs. 50, 52.

On May 12 and May 28, 2009, Mr. Emor directed Ms. Negatu to make two more transfers from SunRise's bank accounts to Core Ventures' account no. xxxxx9526, totaling $250,000.  Gov. Ex. 56.

On July 21, 2009, a second Core Ventures bank account was opened at BB&T Bank, account no. xxxxx3943.  Gov. Ex. 49.  That same day, Mr. Emor directed Ms. Negatu to become a signatory on both Core Ventures bank accounts.  Hr'g Tr. (9/20/11) at 9; Gov. Ex. 49.

Between August and December 2009, Mr. Emor directed Ms. Negatu to make the following transfers of funds from SunRise's bank account to one of the Core Ventures bank accounts: (a) $400,000 was transferred on August 13, 2009; (b) $600,000 was transferred on August 19, 2009; (c) $600,000 was transferred on November 5, 2009.  Gov. Exs. 57, 58, 59.

On January 10, 2010, Mr. Emor caused the last transfer of funds from SunRise to Core Ventures, in the amount of $100,000.  Gov. Ex. 59.

In addition to these wire transfers, as explained above, SunRise also transferred the titles of three vehicles from SunRise to Core Ventures: a Mercedes SUV, an Infiniti G35, and a convertible Mini Cooper.  Hr'g Tr. (9/20/11) at 54-60, 63-64, 67-70; <u>see</u> Gov. Exs. 61, 66. Core Ventures did not provide any compensation to SunRise for these vehicles.  <u>Id</u>.

### c.  Documentation and Business Formalities Regarding Transfer of Funds from SunRise to Core Ventures

Mr. Emor contends that the monetary transfers from SunRise to Core Ventures were loans for the creation of a business that would earn profits to benefit SunRise. Conspicuously absent from the record is any substantive documentation memorializing these

purported loans.  In fact, the only documentation regarding the monetary transfers from SunRise

to Core Ventures are minutes from two SunRise Board meetings created by Ms. Negatu and

financial documents prepared for SunRise by Mr. Leibowitz that characterize the transfers as

loans; Mr. Leibowitz testified that he booked the transfers as loans only because Ms. Negatu told

him that they were loans — he never saw any supporting documentary evidence.  Gov. Exs. 19,

193, 194; Hr'g Tr. (10/18/11 p.m.) at 26-27, 39.

In response to a government subpoena for all documents relating to Core

Ventures, SunRise provided only the minutes of the two Board meetings.  Hr'g Tr. (10/5/11

p.m.) at 33-34; Gov. Exs. 19, 193, 194. When Ms. Negatu was asked whether she had any

documentation of the purported loans other than those Board minutes, she admitted:  "No, I don't

have any documentation."  Hr'g Tr. (9/20/11) at 19.  As discussed further below, the discussion

of Core Ventures at those two meetings exclusively comprised Mr. Emor's representations to Ms.

Negatu and his son about the purpose of the company and the activities in which it would engage.

Mr. Emor did not provide the Board with any documentation regarding the costs of the endeavors

he proposed or any written loan agreement.  Id.  The exact terms of the alleged $2 million loan

were never discussed by the Board, put in writing, or signed by the alleged parties to the loan.  Id.

at 42; Hr'g Tr. (10/5/11 p.m.) at 35-41.  Mr. Emor failed to provide SunRise with a business plan

or other documentation to justify the alleged loan or the amount of the loan.  Hr'g Tr. (9/20/11)

at 19.  Ms. Negatu did not conduct any research related to establishing a vocational school or

coffee shop before the government's seizure of the funds in Core Ventures' bank accounts.  Id. at

19-20; Hr'g Tr. (9/26/11) at 151.

### d. Activity of Core Ventures

At the time that the government seized Core Ventures' funds, the only activity in which the company had engaged was the purchase of two vehicles and the payment of auto insurance premiums.

On May 1, 2009, less than two months after Core Ventures' first bank account was opened, Mr. Emor directed Ms. Negatu to transfer $37,000 from SunRise's bank account to Core Ventures' account, no. xxxxx9526, specifically for the purchase of a 2006 Lexus SUV. Hr'g Tr. (9/20/11) at 24-25; Gov. Exs. 53, 54, 61. According to Ms. Negatu, Mr. Emor was the only individual who drove the Lexus, for "a week or so," before it was placed in storage, and the vehicle was not used for any school-related purpose. Hr'g Tr. (9/20/11) at 48-49; Hr'g Tr. (9/26/11) at 85-86.[4]

On July 20, 2009, a wire transfer of $7,000 from Core Ventures' bank account was made for the purchase of a 2001 Isuzu NQR, a four-by-two "box truck." Hr'g Tr. (9/20/11) at 50-51, 60; Gov. Ex. 55. Although Ms. Negatu testified that "we need that because we do a lot of construction and moving," her testimony did not make clear whether SunRise actually used the vehicle or whether it was merely a type of vehicle that would have been useful to SunRise. Hr'g Tr. (9/20/11) at 51, 53.

Core Ventures also paid insurance on the vehicles titled in its name. Gov. Exs. 50, 67. In addition, it paid the insurance on a 1999 Lexus owned by SunRise and used by Mr. Emor as his personal vehicle. Gov. Exs. 61, 67; Hr'g Tr. (9/20/11) at 51, 61, 65-66.

---

[4] After the government seized the 2006 Lexus, Mr. Emor's former attorney asserted a possessory interest in the Lexus on Mr. Emor's behalf. Gov. Ex. 213.

e. Purpose of Core Ventures

The primary dispute about Core Ventures centers on whether it was, as contended by Mr. Emor, a legitimate enterprise designed to earn profits for SunRise that the school was precluded from earning itself because of its nonprofit status, or whether it was a device contrived by Mr. Emor to create an extra layer disguising his personal exploitation of SunRise funds and making those funds potentially available to him in the event of his incarceration or deportation. The Court finds that the evidence supports the latter theory.

As described above, Ryan Clark from LegalZoom worked with Mr. Emor to create Core Ventures' incorporation documents in June 2008. Mr. Clark's contemporaneous database notes of his conversation with Mr. Emor state that Core Ventures' purpose was "consulting new businesses on how to set up their biz plans, etc." Gov. Exs. 45; 212. An unsigned application for an Employer Identification Number for Core Ventures, generated by LegalZoom, lists the same consulting activity as the principal service to be provided by Core Ventures. Gov. Ex. 212.

Some time later in 2008, Mr. Emor and Ms. Negatu had an impromptu discussion with Louis Leibowitz, SunRise's outside accountant, in which they discussed Core Ventures. Mr. Emor relies heavily on this meeting in support of his narrative about Core Ventures, but it provides scant support for his contentions.

After Mr. Emor and SunRise came under investigation, Mr. Leibowitz was interviewed by IRS agents regarding Mr. Emor, SunRise, and Core Ventures; he later testified before the grand jury investigating Mr. Emor and in the evidentiary hearing before this Court. Before the grand jury, Mr. Leibowitz stated that at some point in 2008 he had an impromptu

meeting with Mr. Emor and Ms. Negatu (after dropping off some financial documents at SunRise) in which they discussed Core Ventures. Mr. Leibowitz could not recall exactly when this meeting took place, although he thought it was "just a couple of months maybe after [Core Ventures] started." Gov. Ex. 219 at 28. At the meeting, Mr. Leibowitz told the grand jury, Mr. Emor informed him that Core Ventures would be a for-profit company that "will provide services to the school." Id. at 29. Specifically, Mr. Leibowitz testified that he was told: "They would provide books and educational equipment and transport — they would buy vehicles for transport equipment." These vehicles would be used to transport "[t]he children to various programs and things." Id. Mr. Leibowitz was asked before the grand jury: "Were you ever told that Core Ventures was going to be opening coffee shops or smoothie shops?" He responded: "No. I was never told that. . . . [Later] I saw something about that on the website, but I was never told about it." Id. at 51.

At the evidentiary hearing before this Court, Mr. Leibowitz testified that some time in 2008 he was part of a conversation in which Mr. Emor and Ms Negatu "discussed the aims of Core Ventures, and . . . threw out a lot of projects that they intended like a coffee shop and talking about other things, maybe buying fruit juices from Sweden and various other things. I think they mentioned they could be buying a transport bus, but these were also thrown out." Hr'g Tr. (10/18/11 a.m.) at 33. During cross-examination, Mr. Leibowitz was again asked what he was told about the purpose of Core Ventures, and he answered: "Open a coffee shop, buy food from Sweden, fruit juice from Sweden, buy equipment for the school, service — services for the school, I'm not sure." Hr'g Tr. (10/18/11 p.m.) at 42-43. Mr. Leibowitz was then confronted with his grand jury testimony, in which he had stated that the purpose of Core Ventures was to

provide educational equipment and transport, and in which he expressly disclaimed that anyone had told him Core Ventures would be opening a coffee shop or smoothie shop. When asked to explain the discrepancy, Mr. Leibowitz stated: "I thought the coffee shop came up [in the meeting], but I may be wrong. I don't know." Id. at 44. He also acknowledged that his recollection of the meeting was better when he testified before the grand jury, nearly a year earlier. Id.

Mr. Leibowitz's vague recollection of his 2008 impromptu meeting with Mr. Emor and Ms. Negatu does not help Mr. Emor establish the truth of his assertions about the intended purpose of Core Ventures. First, the discrepancies between Mr. Leibowitz's grand jury testimony and his testimony before this Court amply demonstrate that he simply does not recall the meeting in great detail. The evidence suggests that during this meeting Mr. Emor informed Mr. Leibowitz about Core Ventures, which he had already incorporated, and "threw out" a variety of vague plans for the company that did not include operating a coffee shop. Contrary to Mr. Emor's assertion in his post-hearing brief, Mr. Leibowitz did *not* testify that he advised Mr. Emor at this meeting that "formation of a separate, for-profit company . . . was necessary because Sunrise, as a tax exempt, nonprofit, 'could not operate a for profit business.'" Emor Br. at 25 (quoting Hr'g Tr. (10/18/11 a.m.) at 33-34). Rather, Mr. Leibowitz testified that he was presented with the idea of Core Ventures as a for-profit entity by Mr. Emor, at a meeting that took place *after* Mr. Emor had already formed Core Ventures. Hr'g Tr. (10/18/11 a.m.) at 33-34; Hr'g Tr. (10/18/11 p.m.) at 24.[5] The extent to which Mr. Emor seeks to wrench significance

---

[5]     Mr. Leibowitz's comment at the evidentiary hearing about whether a nonprofit could operate a for-profit business was not a representation of what he advised Mr. Emor in 2008; rather, it was a response to a question from Mr. Emor's counsel about Mr. Leibowitz's

from this single unplanned meeting is an indication of just how thin the evidence is supporting

his narrative about Core Ventures.

In support of his version of events, Mr. Emor also relies on the minutes of two

SunRise Board meetings and the testimony of Ms. Negatu.  Mr. Emor first discussed Core

Ventures with the SunRise Board on February 25, 2009.  At that time, the Board consisted of Mr.

Emor, Ms. Negatu, and Mr. Anuforah (Mr. Emor's son).  According to Ms. Negatu, at this

meeting Mr. Emor explained the idea behind Core Ventures and requested a loan from SunRise

to the new company in order to fund the development of a coffee shop or vocational school.

Hr'g Tr. (9/20/11) at 16, 40-43.  Handwritten Board minutes taken by Ms. Negatu at this meeting

state:  "Emor introduced Core Venture and how [illegible] to have incorporated for more income

to come to SunRise Academy.  Core Ventures can have deli coffee shop, vocational school,

internet café.  Residential Program in the future.  SRA [illegible] Core money for year.

[Illegible] paid for the 100K."  Gov. Ex. 193; Hr'g Tr. (9/20/11) at 41-42.[6]

_____

understanding of the law.  Hr'g Tr. (10/18/11 a.m.) at 33-34.

[6]     Ms. Negatu later prepared typed Board minutes for this February 25, 2009,
meeting, although apparently not until March 2010, over a year after the meeting occurred and at
a point at which she and the other SunRise directors likely were aware of the government's
investigation of SunRise's finances.  Gov. Ex. 19; see also Gov. Ex. 20 (Board minutes for April
2010 meeting, including as a topic of discussion "[c]urrent Federal investigation of SunRise
Academy").  The typed minutes of the February 2009 meeting include greater detail about the
purpose and the terms of the proposed loan to Core Ventures.  In light of when these typed
minutes were prepared and their substantial variation from the contemporaneous handwritten
minutes, the Court accords them little weight.  But even if these minutes accurately reflect the
discussion at the February 2009 Board meeting, they remain of limited significance, because they
are still based entirely on Mr. Emor's representations to Ms. Negatu and Mr. Anuforah about
Core Ventures.

Hand-written minutes for a Board meeting on August 27, 2009, also prepared by Ms. Negatu, refer to "the idea of Core Ventures providing services to SunRise if Core Ventures will charge SunRise for service provide", and state: "When the coffee shop open Core will hire SRA students to work[.]" Gov. Ex. 194. The typed minutes for that meeting include as an agenda item "Engage in Business/Contract with Core Ventures" and resolve that "SunRise Academy will engage in a business contract with Core Ventures effective September 1st, 2009." Gov. Ex. 19.

At the evidentiary hearing, Ms. Negatu testified to her belief that Core Ventures was created and funded for the purposes described in these Board minutes. But her testimony and the Board minutes are of little help to Mr. Emor, because both derive entirely from Mr. Emor's own representations to Ms. Negatu and to his son. Mr. Emor formed Core Ventures in 2008, a year in which SunRise did not hold any Board meetings and before Ms. Negatu and Mr. Anuforah had joined the Board. Gov. Ex. 18; Def. Ex. 3. Ms. Negatu had no knowledge of Core Ventures independent of what Mr. Emor told her, and she could identify no documentation regarding the ownership of Core Ventures or the "loans" it received from SunRise.

Mr. Emor also cites tax returns and financial statements prepared for SunRise by Mr. Leibowitz that designate the transfers to Core Ventures as loans. This evidence is unavailing because it similarly rests entirely on Mr. Emor's own representations about Core Ventures. The records created by Mr. Leibowitz, like his testimony about the 2008 meeting, simply cannot bear the weight that Mr. Emor places upon them. Mr. Leibowitz was not a SunRise employee, nor did he conduct audits of SunRise. Hr'g Tr. (10/18/11 p.m.) at 4. As a retained outside accountant ("basically . . . a bookkeeper," as he acknowledged), Mr. Leibowitz prepared balance sheets,

profit and loss statements, and tax returns based exclusively on the information that he was given by SunRise.  Id. at 4-5, 17-18.  For instance, when Mr. Leibowitz asked SunRise principal Ms. Edwards about payments to Esquire Custom Tailors, he was told that those charges were for student clothing.  Id. at 12.  When he asked about the use of eBay and PayPal, he was told that the purchases were for school computers.  Id.  He did not know, and "would have been surprised" to learn, that one of SunRise's properties that he had listed as a SunRise asset was being used by Mr. Emor as his primary residence.  Id. at 12-13.  With respect to Core Ventures, Mr. Leibowitz never saw any loan documentation regarding the transfers from SunRise and Core Ventures, aside from the Board minutes discussed above.  Hr'g Tr. (10/18/11 p.m.) at 38-39.  His identification of SunRise's monetary transfers to Core Ventures as loans was based entirely on Mr. Emor's and Ms. Negatu's representations.  Id. at 26-27.

Finally, Mr. Emor also points to evidence showing that SunRise Academy undertook preparatory efforts geared toward the creation of a coffee shop, including renting a space near the school and hiring an architectural firm to draw up plans.  Little in the record links this effort to Core Ventures, however.  No funds from Core Ventures' bank accounts were ever spent on either a coffee shop project or a vocational school.  SunRise continued to pay the rent, around $2,000 a month, for the property in question well after funds were placed in Core Ventures' bank account.  Hr'g Tr. (9/20/11) at 84-92; Hr'g Tr. (9/26/11) at 63; Gov. Exs. 50, 70; Def. Ex. 36A.  No rent or architectural firm payments were made from Core Ventures' accounts. Hr'g Tr. (10/5/11 p.m.) at 30-31.  All funds spent on a coffee shop project were provided directly out of SunRise's bank accounts.  Hr'g Tr. (9/20/11) at 84-92; Gov. Exs. 50, 70; Def. Exs. 32-36. The architectural drawings list SunRise, not Core Ventures, and the zoning notice lists Mr. Emor,

not Core Ventures.  Gov. Ex. 27; Def. Exs. 34, 36.  Any credence these preparatory efforts might lend to Mr. Emor's account of Core Ventures is undercut by this evidence, which tends to support the government's theory that Mr. Emor used a separate SunRise initiative as a cover for his creation of Core Ventures.  A business plan for "Core Café" was not produced by Ms. Negatu until late 2010 — *after* the government had seized Core Ventures' funds and at a time when SunRise no longer had any students because OSSE had revoked its Certificate of Approval.  Hr'g Tr. (9/26/11) at 150-53; Def. Ex. 42.

Nor is the Court persuaded by the suggestion that Mr. Emor purchased luxury cars to make money for SunRise by reselling them at a higher price, and that the titles to these cars were transferred to Core Ventures out of a belief that SunRise, as a nonprofit organization, could not sell them for a profit.  See Hr'g Tr. (9/26/11) at 84-85.  There is no evidence that any of these vehicles were ever offered for sale.  Instead, they were either used by Mr. Emor or sat idle for over a year, depreciating in value.  Significant costs were incurred in transferring the vehicles originally titled in the name of SunRise to Core Ventures.  The taxes and fees paid to transfer title of the Mercedes to Core Ventures, for example, totaled $2,968.  Gov. Ex. 64.  The idea that these actions were taken to make money for Sunrise is simply implausible.  It also defies logic that Mr. Emor believed that SunRise could not purchase a vehicle and sell it at a profit, but that SunRise could purchase a vehicle, transfer the title to a for-profit company, and then have that company sell it for a profit and remit the proceeds to SunRise.  Tellingly, in the only instance in the record where Mr. Emor sold a vehicle, the 2003 Volvo, he deposited the $12,000 proceeds from the sale into his own bank account, dispelling any notion that he was concerned about the type of legal niceties upon which much of his account of Core Ventures is based.

All told, the evidence on Core Ventures boils down to the following. At a time when Mr. Emor had strong reason to believe that he might be incarcerated and/or deported because of his prior conviction, he created a for-profit company with no legal affiliation to SunRise in which he owned a one hundred percent interest. After creating a bank account for the company over which he held signatory authority, during the next year and a half he directed Ms. Negatu to transfer over $2 million from SunRise to Core Ventures with no contract or loan documentation binding Core Ventures to return the money. He provided one purpose for the company at the time of incorporation (consulting), floated a variety of different purposes in a subsequent meeting with SunRise's accountant (providing books and transportation), and later proposed different purposes to the SunRise Board (coffee shop and vocational school). He led SunRise's other Board members — both young, inexperienced, and beholden to him — to believe that SunRise had a formal affiliation with the company. He promptly used money transferred by SunRise to Core Ventures to purchase an expensive Lexus that was not related to any of the company's ostensible purposes.

These circumstances lead to the following conclusion: Mr. Emor used Core Ventures as a means to make his personal use of SunRise funds even less subject to outside scrutiny and to ensure that those funds would remain available to him in the event of his imprisonment or deportation. The evidence simply does not support Mr. Emor's exculpatory narrative about the purpose for which he formed Core Ventures and caused SunRise money to be transferred to it.

*H.  Mr. Emor's Control Over SunRise and its Board*

The Court finds that Mr. Emor exerted total control over SunRise and its Board of Directors, which provided him with the opportunity to implement his fraud scheme.

Mr. Emor was the only individual who had full access to SunRise's bank accounts over the duration of the entire fraud scheme.  Hr'g Tr. (9/19/11) at 30.  In June 2008, Bank of America severed its ties with SunRise because of Mr. Emor's prior criminal conviction.  Id. at 35-38.  At Mr. Emor's direction, SunRise opened a money market account, checking account, and payroll account at BB&T bank, where Mr. Emor continued to have signatory authority over all SunRise accounts even though he had publicly stepped down as Executive Director.  Id. at 38-39; Gov. Ex. 8.  Mr. Emor required Ms. Negatu to provide him with monthly, weekly, and daily reporting of SunRise's bank account activity and balances.  Hr'g Tr. (9/20/11) at 18, 77-80; Gov. Exs. 173-74.

There was no oversight of Mr. Emor's use of SunRise's bank accounts.  Unlike all other SunRise staff, who were required to submit requisition forms — including teachers seeking educational materials for their classrooms — Mr. Emor was able to make purchases without any documentation or subject to any approval.  Hr'g Tr. (9/19/11) at 51-53.  Although Ms. Negatu kept the books, she never questioned why Mr. Emor's purchases were not supported by requisition forms.  Hr'g Tr. (9/19/11) at 59.  On several occasions SunRise's outside accountant, Mr. Leibowitz, inquired about particular expenditures by Mr. Emor, and he was routinely told by SunRise staff that these purchases were for educational purposes.  Hr'g Tr. (10/18/11 p.m.) at 9-12, 61.

In addition to failing to check Mr. Emor's expenditure of SunRise funds through personal purchases, SunRise facilitated his use of school funds in other ways. Mr. Emor lived in a townhouse owned and paid for by SunRise. Hr'g Tr. (9/19/11) at 186. SunRise paid for Mr. Emor's legal bills resulting from his prior prosecution for a conspiracy to sell stolen computers. At Mr. Emor's suggestion, the Board of Directors agreed to continue to pay Mr. Emor's salary while he was incarcerated for that conviction. Hr'g Tr. (9/19/11) at 45-46; Gov. Ex. 19; Def. Ex. 3. In November 2009, after SunRise employees suggested recognizing Mr. Emor's ten-year contribution to the school in the form of a video, Mr. Emor suggested that he receive a $500,000 bonus instead, and the Board — then consisting of his son and Ms. Negatu — approved this suggestion. Hr'g Tr. (9/19/11) at 180, 184-85; Gov. Ex. 19; Def. Ex. 3. At Mr. Emor's direction, Ms. Negatu later wired funds from SunRise to his commissary account in prison. Id. at 82-84; Gov. Exs. 89, 90, 204A.

During the crucial period of 2009 and early 2010, when SunRise transferred over $2 million to Core Ventures, SunRise's board comprised Mr. Emor, Ms. Negatu, and Mr. Emor's college-age son, Mr. Anuforah. Mr. Emor has not been able to identify a single incident in which the Board did not approve his requests, and Ms. Negatu could recall no such incident. Hr'g Tr. (9/19/11) at 188-89. The evidence clearly demonstrated that Ms. Negatu — a family friend since the age of twelve who was hired by SunRise for her first job out of college — did Mr. Emor's bidding virtually without question. Her subservience to Mr. Emor was demonstrated by telephone calls between her and Mr. Emor while he was in prison, in which he could be heard ordering her in minute and pedantic detail to carry out various tasks. Gov. Ex. 187. It was further demonstrated by the detailed logs of her daily activities that she was required to supply to

Mr. Emor each week.  See Gov. Exs. 173-74.  As a Board member, on the few occasions when she questioned a proposal of Mr. Emor — such as the decision to pay the rent and utilities for Ms. Coker — she inevitably acquiesced to Mr. Emor's "explanation" of why his proposal was appropriate.  See Hr'g Tr. (9/19/11) at 77-78.  When asked at the hearing whether Mr. Emor's suggestions were "always approved" by the Board, Ms. Negatu responded: "They do make sense because of his experience, yes." Id. at 188.  She elaborated that she and Mr. Anuforah "listen[ed] to Mr. Emor because of his experience of being in the special [education] and being in business and he's mature and he's older than us, so most of the time his advice does make sense." Id. at 188-89.

The Court did not hear testimony from Mr. Anuforah, but he was about twenty years old at the time he served on the Board and appears to have been equally deferential to his father's directives.  He also benefitted from his father's largesse through gifts and college tuition paid to him out of SunRise funds.  The evidence is unmistakable that during the period of the fraud scheme Mr. Emor controlled every facet of SunRise and its finances, including the decisions made by its Board of Directors.

## IV.  CONCLUSIONS OF LAW

Pursuant to Mr. Emor's plea agreement, the parties presented evidence at a hearing in order for the Court to determine (1) the amount of loss caused by Mr. Emor's offense; (2) the victims of his offense and how much was owed in restitution to each; and (3) whether the properties seized by the government from Core Ventures were subject to forfeiture and the amount of any forfeiture money judgment.

Restitution and forfeiture are separate monetary obligations and distinct legal remedies that serve different purposes. United States v. McGinty, 610 F.3d 1242, 1247-48 (10th Cir. 2010); accord United States v. Browne, 505 F.3d 1229, 1281 (11th Cir. 2007) (explaining that restitution focuses on the victim while forfeiture focuses on imposing punishment by forcing the defendant to disgorge the proceeds of his criminal activity).

The government bears the burden of proving by a preponderance of the evidence that restitution is appropriate and the amount of loss sustained by a victim. 18 U.S.C. § 3664(e); United States v. Karam, 201 F.3d 320, 327 (4th Cir. 2000). When seeking forfeiture, the government also has the burden of proving its right to forfeiture of the property by a preponderance of the evidence. 21 U.S.C. § 853(d); 18 U.S.C. § 982(b)(I); United States v. Bornfield, 145 F.3d 1123, 1134 (10th Cir. 1998).

The Court has concluded that the amount of loss caused by Mr. Emor's scheme, the amount of restitution owed to the victims of that scheme, and the amount subject to criminal forfeiture in the form of a money judgment are identical: $2,358,536.40. The Court has also determined that the property seized from Core Ventures is subject to forfeiture.

## A. Amount of Loss

Because the Court already has sentenced Mr. Emor pursuant to his plea agreement after making a preliminary determination of the amount of loss, the Court's final determination of the loss amount is somewhat academic. But the Court will explain the reasoning behind its calculation of the loss amount, in part because it also is ordering that the same amount be paid in restitution and that a money judgment be entered against Mr. Emor for that amount.

Before sentencing Mr. Emor, the Court made a preliminary determination of the amount of loss. As a starting point, the Court used the government's calculation of the total loss caused by Mr. Emor's purchases and transactions. See Gov. Ex. 204A. Because the Court had not yet made a determination about whether Core Ventures was part of Mr. Emor's fraud scheme, the Core Ventures transfers were excluded. The Court also excluded seven transactions, totaling $32,971, that the government had included in its loss calculations but that FBI Agent John McNair, testifying at the evidentiary hearing, recommended excluding from consideration because it was not clear to him that those transactions involved the fraudulent use of SunRise funds for personal benefit. Finally, the Court also excluded watches, cufflinks, and jewelry that cost less than $150, along with certain other items that might have been gifts to staff or students. See Memorandum Opinion and Order (Oct. 21, 2011) [Dkt. No. 61].

These calculations led to a preliminary loss amount of $230,281.40. The Court now adjusts that figure in three ways. First, it subtracts $1,590 corresponding to a check to "HA" that had been included in the preliminary calculation; it is unclear who the recipient of the check was. See Gov. Ex. 84. Second, the Court adds $42,845 to the loss amount. This represents the cost of the two vehicles purchased with Core Ventures funds; the Court had subtracted this amount in its earlier calculation, but the government had never included the amount in its own loss calculation — which the Court used as a baseline — and so the amount should not have been subtracted as part of the preliminary calculation. See Gov. Ex. 204A. Finally, because the Court has now determined that the Core Ventures transfers were part of Mr. Emor's fraud scheme, the Court adds the $2,087,000 of those transfers. As a result of these adjustments, the Court now concludes that the total loss amount is $2,358,536.40.

*B. Restitution*

The Mandatory Victims Restitution Act ("MVRA") requires courts to order restitution to the victims of certain offenses, including wire fraud and other crimes "committed by fraud or deceit." 18 U.S.C. § 3663A(c)(1)(A)(ii); United States v. Lazar, 770 F. Supp. 2d 447, 450 (D. Mass. 2011). The statute directs that "in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity," the court must order restitution to "any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663A(a)(2). "The primary and overarching goal of the MVRA is to make victims of crime whole" and to "'restore these victims to their original state of well-being.'" United States v. Gordon, 393 F.3d 1044, 1048, 1053 (9th Cir. 2004) (quoting United States v. Simmonds, 235 F.3d 826, 831 (3d Cir. 2000)). "'Restitution under the MVRA is a criminal penalty and a component of the defendant's sentence.'" United States v. Adams, 363 F.3d 363, 365 (5th Cir. 2004) (quoting United States v. Chaney, 964 F.2d 437, 451 (5th Cir. 1992)).[7]

1. Amount of Restitution

In Hughey v. United States, 495 U.S. 411, 420 (1990), the Supreme Court held that where a defendant pleads guilty to a single count, restitution under the Victims and Witness Protection Act is limited to the damage caused by that single count. Congress subsequently

---

[7]     Even if restitution were not required in this case by the MVRA, the Court would have discretion to impose restitution under the Victim and Witness Protection Act ("VWPA"), 18 U.S.C. § 3663(a)(1)(A). See 18 U.S.C. § 3556 ("The court, in imposing sentence on a defendant who has been found guilty of an offense shall order restitution in accordance with section 3663A, and may order restitution in accordance with section 3663.").

amended the VWPA to provide that where a defendant is found guilty of an offense involving a scheme, conspiracy, or pattern of criminal activity, the court may award restitution to any person directly harmed in the course of the scheme, conspiracy, or pattern.  18 U.S.C. § 3663(a)(2).  Thus, "where a fraudulent scheme is an element of the conviction, the court may award restitution for 'actions pursuant to that scheme.'"  United States v. Cothran, 302 F.3d 279, 289 (5th Cir. 2002) (quoting United States v. Stouffer, 986 F.2d 916, 928 (5th Cir. 1993)).  Federal courts therefore "may order restitution encompassing losses resulting from a criminal scheme 'regardless of whether the defendant is convicted for each criminal act within the scheme,' so long as the loss is a direct result of the defendant's criminal conduct or 'is closely related to the scheme.'"  United States v. Karam, 201 F.3d at 325-26 (quoting United States v. Henoud, 81 F.3d 484, 488 (4th Cir. 1996)); accord United States v. Grice, 319 F.3d 1174, 1175-79 (9th Cir. 2003) (affirming award of restitution for full fraud scheme even though defendant pled only to part); United States v. Arnold, 947 F.2d 1236, 1237-38 (5th Cir. 1991) (holding that where the defendant pled guilty to one count of wire fraud, restitution under the recently amended VWPA was not limited to the $23,000 loss caused by that single count but rather encompassed the full $669,000 loss caused by the scheme as a whole).

Congress utilized identical language when it later enacted the MVRA.  Compare 18 U.S.C. § 3663A(a)(2) with 18 U.S.C. § 3663(a)(2).  Under both the MVRA and the VWPA, therefore, courts may award restitution to victims for actions taken by a defendant pursuant to the fraudulent scheme for which he has been convicted that caused damage to the victims.  United States v. Adams, 363 F.3d at 366; United States v. Elson, 577 F.3d 713, 723 (6th Cir. 2009) ("[U]nder the MVRA, 'if someone is convicted of a conspiracy, the court can order restitution for

damage resulting from any conduct that was part of the conspiracy and not just from specific conduct that met the overt act requirement of the conspiracy conviction.'") (quoting United States v. Bussell, 504 F.3d 956, 966 (9th Cir. 2007)). Thus, in determining the amount of restitution a defendant must pay, the court's task is to determine the scope of the defendant's fraud scheme and the harm suffered by victims as a result of conduct taken by the defendant pursuant to that scheme.

In determining "the scope of the offense of conviction for purposes of restitution," United States v. Elson, 577 F.3d at 723 (internal quotations omitted), courts look to a variety of sources. Where a defendant has pled guilty, "the scope of the underlying scheme is defined by the parties themselves." United States v. Adams, 363 F.3d at 367. Courts therefore may consider the plea agreement, the statement of the offense, the plea colloquy, and other statements made by the parties at the plea or sentencing stage, in addition to the indictment or information. Id. at 366-67; United States v. Elson, 577 F.3d at 723; United States v. Cothran, 302 F.3d at 289.

Mr. Emor pled guilty to one count of wire fraud as set forth in the government's Superseding Information.[8] In pleading guilty to this single count of wire fraud, however, Mr. Emor acknowledged that a "goal of the scheme and artifice" was "to fraudulently obtain money, from SunRise's bank accounts, for his own use and benefit, and for the use and benefit of his friends and relatives, and to further the scheme by various means, including omissions of material fact, false material pretenses, representations and promises." Stmnt. Off. ¶ 7. He further

---

[8]    Wire fraud requires that a defendant "knowingly and willingly entered into a scheme to defraud" and that "an interstate wire communication was used to further the scheme." United States v. Tann, 532 F.3d 868, 872 (D.C. Cir. 2008) (citing United States v. Alston-Graves, 435 F.3d 331, 337 (D.C. Cir. 2006)).

acknowledged that as part of this scheme and artifice, "through various misrepresentations and omission of material facts, [he] used the money obtained from SunRise's bank accounts in a manner unrelated to the education of students with disabilities at SunRise." Id. ¶ 8. Thus, Mr. Emor's fraud scheme, as agreed to by Mr. Emor, encompassed two distinct facets: (1) obtaining money from SunRise for his own benefit, and (2) actually spending such money in a manner unrelated to SunRise's educational mission.

As explained earlier, the Court has determined that Mr. Emor caused $272,184.40 of SunRise's funds to be spent for his own personal benefit through checks, wire transfers, and debit/credit purchases. The Court has also concluded that Mr. Emor caused $2,087,000 to be extracted from SunRise for his own benefit through bank transfers to Core Ventures. Combining these figures, the Court finds that the amount of restitution owed by Mr. Emor is $2,358,536.40, which corresponds to the total amount of harm caused by his fraud scheme.

## 2. Victims Entitled to Restitution

The count of wire fraud to which Mr. Emor pled guilty states that he devised "a scheme and artifice to defraud and to obtain money by means of materially false and fraudulent pretenses" and that he furthered the scheme through "omissions of material fact, false material pretenses, representations and promises." Sup. Info. ¶¶ 7, 8. The failure to specify *to whom* Mr. Emor directed his "misrepresentations and omission of material facts," id., has been the cause of much contention in this case. Mr. Emor suggests that the only victim of his offense is SunRise Academy, some of whose funds Mr. Emor spent on personal purchases unrelated to education. The government argues that because the funds in question derived exclusively from the District

of Columbia and the federal government, which gave them to SunRise for the purpose of educating special needs students and providing related services, the District of Columbia and the federal government are also victims. The government further argues that even though SunRise is a victim of Mr. Emor's fraud, it is not entitled to restitution.

A "victim" under both the MVRA and the VWPA means "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered." 18 U.S.C. § 3663A(a)(2); 18 U.S.C. § 3663(a)(2). "[I]n the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity," a victim includes "any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." Id. The restitution statutes contemplate that more than one victim may have sustained a loss requiring restitution by the defendant. See 18 U.S.C. §§ 3664(f)(2), 3664(I). The Court will address in turn the potential victims in this case: SunRise, the District of Columbia, and the federal government.[9]

### a. SunRise Academy

The most obvious potential victim of Mr. Emor's fraudulent scheme is SunRise itself. The funds that Mr. Emor spent on his own purchases came from SunRise's bank accounts, as did the two million dollars that he had transferred to Core Ventures. But although SunRise was "directly and proximately harmed as a result of" Mr. Emor's fraud scheme through the loss of its funds, 18 U.S.C. § 3663A(a)(2), the Court concludes that it is not entitled to restitution

---

[9]    "[T]he government can be a 'victim' under the MVRA." United States v. Quarrell, 310 F.3d 664, 677 (10th Cir. 2002); see United States v. Ekanem, 383 F.3d 40, 43 (2d Cir. 2004) (holding that the government or a governmental entity may be a victim under the MVRA); 18 U.S.C. § 3664(i) (referring to cases "in which the United States is a victim").

under the MVRA for two reasons.

### i. Alter Ego

The government prevails upon the Court to find that SunRise was the defendant's alter ego during the time of his fraud scheme and that SunRise therefore is ineligible to be considered a victim of his scheme. The Court agrees.

"A corporation is ordinarily to be viewed as a distinct entity, even when it is wholly owned by a single individual. This concept is, however, designed to serve normal, inoffensive uses of the corporate device, and is not to be stretched beyond its reason and policy." Quinn v. Butz, 510 F.2d 743, 757 (D.C. Cir. 1975). Accordingly, "'[t]he courts have consistently recognized that a corporate entity must be disregarded in the interest of public convenience, fairness and equity. . . . [W]hen the notion of legal entity is used to defeat public convenience, justify wrong, protect fraud, or defend crime, the law will regard the corporation as an association of persons.'" Id. at 757-58 (quoting Capital Tel. Co. v. FCC, 498 F.2d 734, 738 (D.C. Cir. 1974)). "[P]iercing the corporate veil is an equitable remedy, whose exercise is subject to the sound discretion of the trial judge." United States v. Andrews, 146 F.3d 933, 940 (D.C. Cir. 1998) (citing Valley Finance, Inc. v. United States, 629 F.2d 162, 171-72 (D.C. Cir. 1980)). "'The ultimate principle is one permitting its use to avoid injustice.'" Id. (quoting Quinn v. Butz, 510 F.2d at 759).

The prototypical scenario in which courts disregard the corporate form is where the "corporation is simply the alter ego of its owners." Quinn v. Butz, 510 F.2d at 758 (citing Chicago, M. & St. P. Ry. v. Minneapolis Civic & Commerce Ass'n, 247 U.S. 490, 500-01

(1918)). Where there is "such domination of a corporation [by an individual] as in reality to negate its separate personality," courts will "disregard[] the corporate fiction where its recognition would pervert the truth." Id. "Treating a corporation as the alter ego of another entity is the same thing as piercing the corporate veil: it comes down to disregarding the corporation's separate existence," In re Capitol Hill Healthcare Group, 242 B.R. 199, 203 (Bankr. D.D.C. 1999), "in order to avoid injustice." United States v. Andrews, 146 F.3d 933 at 940 (quoting Quinn v. Butz, 510 F.2d at 759).

While piercing the corporate veil is "typically at issue in cases of common-law liability," Liberty Property Trust v. Republic Properties Corp., 577 F.3d 335, 340 (D.C. Cir. 2009), the doctrine has been applied in a variety of contexts. See, e.g., Bufco Corp. v. N.L.R.B., 147 F.3d 964 (D.C. Cir. 1998) (labor); Valley Finance, Inc. v. United States, 629 F.2d 162 (D.C. Cir. 1980) (tax); Quinn v. Butz, 510 F.2d 743 (D.C. Cir. 1975) (administrative law); United States ex rel. Siewick v. Jamieson Science and Engineering, Inc., 191 F. Supp. 2d 17, 20 (D.D.C. 2002) (False Claims Act); United States v. BCCI Holdings, 977 F. Supp. 27, 29 (D.D.C. 1997) (criminal forfeiture).

"Although the law of the state where a corporation is incorporated . . . normally dictates whether the corporate veil should be pierced, federal common law governing the veil-piercing question is applicable to cases where 'some federal interest is implicated by the veil-piercing inquiry.'" United States ex rel. Siewick v. Jamieson Science and Engineering, Inc., 191 F. Supp. 2d at 20 (quoting United States Through the Small Bus. Admin. v. Trotter, 731 F.2d 8, 12 (D.C. Cir. 1984)). Situations involving a "federal interest" include those where the federal government has a financial stake in the outcome. See id. at 20-21 ("The government's interest in

protecting itself from fraud, as embodied in the False Claims Act, makes it reasonable to apply the federal common law standard for piercing the corporate veil instead of the test set forth by the state courts in Maryland[.]").  Also included are circumstances in which the government's regulatory interests are implicated through a federal statute.  See United States Through the Small Bus. Admin. v. Trotter, 731 F.2d at 12 ("The question whether a corporate veil ought to be pierced for purposes of applying some federal statute is distinct from whether a corporate veil ought to be pierced for purposes of allocating state tort or contract liabilities.").[10]

The D.C. Circuit "employs a two-prong test to determine whether federal common law supports piercing the corporate veil: '(1) is there such a unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist?; and (2) if the acts are treated as those of the corporation alone, will an inequitable result follow?'"  United States ex rel. Siewick v. Jamieson Science and Engineering, Inc., 191 F. Supp. 2d at 21 (quoting Labadie Coal Co. v. Black, 672 F.2d 92, 96 (D.C. Cir. 1982)).  Put another way, the test is: "(1) have the shareholder and the corporation failed to maintain separate identities? and (2) would adherence to the corporate structure sanction a fraud, promote injustice, or lead to an evasion of legal obligations?"  Bufco Corp. v. N.L.R.B., 147 F.3d at 969.

The alter ego doctrine typically is used to hold a shareholder or other dominant figure personally responsible for the liabilities of the corporation.  See Labadie Coal Co. v.

---

[10]     In this case, the choice between federal and local law has "little practical significance," because the standards for veil-piercing under federal and District of Columbia law are "substantively identical."  TAC-Critical Systems, Inc. v. Integrated Facility Systems, Inc., 808 F. Supp. 2d 60, 65 (D.D.C. 2011); accord McWilliams Ballard, Inc. v. Broadway Management Co., 636 F. Supp. 2d 1, 7-8 (D.D.C. 2009) ("[T]he difference between federal alter ego law and D.C. alter ego law is immaterial.").

Black, 672 F.2d at 96 ("[W]hen particular circumstances merit . . . courts may look past a corporation's formal existence to hold shareholders or other controlling individuals liable for 'corporate' obligations."). Hence the fiction of a separate corporate personality is "pierced" to reach the individual behind the corporation. In this case, by contrast, the government asks the Court to do precisely the opposite: to deny victim status to SunRise, the corporation, by holding it accountable for the fraud of its dominant figure, Mr. Emor. This maneuver, sometimes called "reverse piercing of the corporate veil," has also been employed by courts to disregard the corporate form in the interests of justice. See 1 WILLIAM MEADE FLETCHER, CYCLOPEDIA OF THE LAW OF CORPORATIONS § 41.70 (rev. ed. 2011). Occasion for this doctrine frequently arises where the federal government seizes the assets of a corporation to satisfy the delinquent tax obligations of an individual shareholder. See, e.g., LiButti v. United States, 107 F.3d 110, 119 (2d Cir. 1997); Towe Antique Ford Foundation v. IRS, 999 F.2d 1387, 1390-91 (9th Cir. 1993); Valley Finance, Inc. v. United States, 629 F.2d 162 (D.C. Cir. 1980). In Valley Finance, for example, the IRS seized assets of a company that it claimed was "a mere alter ego" of an individual taxpayer. The D.C. Circuit affirmed the district court's upholding of the seizure, concluding that the company was in fact the alter ego of its owner. Valley Finance, Inc. v. United States, 629 F.2d at 166, 171-73. A similar "reverse piercing" theory was invoked to uphold a levy on the property of a company that was the alter ego of a taxpayer in Towe Antique Ford Foundation v. IRS, 999 F.2d at 1390-91; cf. IBF Corp. v. Alpern, 487 A.2d 593, 594-97 & n.8 (D.C. 1985) (affirming "reverse veil-piercing" authorized by D.C. Code § 16-579).[11]

---

[11]     Although the "reverse veil-piercing" doctrine has most commonly been applied by federal courts in the tax context, it does not derive from the Internal Revenue Code, which merely permits the government to secure a lien on "all property and rights to property, whether

"The mere fact that a corporation is a nonprofit corporation does not by itself preclude a court from applying the equitable remedy of piercing the corporate veil." FLETCHER, supra, § 41.75.  This is to be expected, because the essence of the alter ego doctrine is not about the ownership of shares, or formalities of any kind, but is instead about control.  Even in the context of a for-profit company, the equitable remedy may be applied to reach individuals who possess no formal ownership interest in the corporation:

> The question before the court in a case like this is whether the corporation, rather than being a distinct, responsible entity, is in fact the alter ego or business conduit of *the person in control*. In many instances, the person 'controlling' a close corporation is also the sole, or at least a dominant, shareholder.  In other cases the controlling person may seek to avoid personal liability by not formally becoming a shareholder in the corporation. The question is one of control, not merely paper ownership.

Labadie Coal Co. v. Black, 672 F.2d at 97 (emphasis in original); see id. ("It is apparent from the existing record that Mr. Black is in fact the dominant figure in FAI enterprises even though he formally controls no shares."); LiButti v. United States, 107 F.3d at 119 (finding that unincorporated business could be subject to reverse veil-piercing, and noting that courts "must avoid an over-rigid preoccupation with questions of structure" and "apply the preexisting and overarching principle that liability is imposed to reach an equitable result") (quotation omitted).

Still, such domination of a corporation by a single individual, by itself, is not enough to find the corporation to be the individual's alter ego.

> The doctrine of alter ego is brought to bear only upon a showing "not merely of single ownership, or of deliberate adoption and use

real or personal, belonging to" a delinquent taxpayer.  26 U.S.C. § 6321.  In the tax context, as elsewhere, the doctrine is an equitable remedy.  See Valley Finance, Inc. v. United States, 629 F.2d at 171.

> of a corporate form in order to secure its legitimate advantages, but
> of such domination of a corporation as in reality to negate its
> separate personality" in circumstances in which "at some innocent
> party's expense, the corporation is converted into such an
> instrumentality," with the result that the corporate identity is
> disregarded "as the justice of the case may require."

In re Capitol Hill Healthcare Group, 242 B.R. at 203 (quoting Quinn v. Butz, 510 F.2d at 758).

Courts must assess a variety of factors besides domination of the organization by a single

individual — including a failure to maintain corporate minutes or adequate corporate records,

commingling of funds and other assets of the corporation, and diversion of the corporation's

funds or assets to non-corporate uses such as personal use by the corporation's shareholders or

the dominant, controlling person. See Labadie Coal Co. v. Black, 672 F.2d at 97-99.[12] Not all

factors need be present in order to justify piercing the corporate veil, however. Id. at 97. "As a

general matter, veil-piercing analysis depends more on the facts than on any sharply defined

underlying legal standard." United States Through the Small Bus. Admin. v. Trotter, 731 F.2d at

13. The "essential legal test in all jurisdictions" is whether it would be equitable to look behind

the corporate form under the circumstances presented. Id.

  The Court concludes that there is such a unity of interest between Mr. Emor and

SunRise, and such merging of their identities, that the two effectively no longer have separate

personalities. Bufco Corp. v. N.L.R.B., 147 F.3d at 969; Labadie Coal Co. v. Black, 672 F.2d at

96. As described in the Court's findings of fact, Mr. Emor exercised total control over SunRise.

He possessed unchecked authority to make use of its funds as he saw fit and he exercised

---

[12] Courts applying D.C. law look to similar factors. See Ruffin v. New
Destination, LLC, et al., 773 F. Supp. 2d 34, 40 (D.D.C. 2011); TAC-Critical Sys., Inc. v.
Integrated Facility Sys., Inc., et al., 808 F. Supp. 2d at 67.

ultimate power over all its corporate decisionmaking. Not a single instance was brought to the Court's attention in which anyone from SunRise or its Board said no to one of Mr. Emor's proposals or questioned his use of SunRise funds. To the contrary, SunRise staff and Board members often facilitated his most questionable directives. SunRise's Board was particularly nominal during the most crucial period of the fraud scheme, when it was comprised of Mr. Emor's college-age son and Ms. Negatu, neither of whom possessed the experience or the independence necessary to do anything other than approve Mr. Emor's plans. Ms. Negatu acknowledged that Mr. Emor's suggestions were always approved; she explained that this was because they "ma[d]e sense because of his experience" and because "he's mature and he's older than us." Hr'g Tr. (9/19/11) at 77-78, 188-89.

SunRise also failed to consistently maintain adequate corporate minutes or records. At no point in 2008 did the Board of Directors meet. In 2009 — at the time that SunRise was transferring over two million dollars in funds to Core Ventures — only sparse, single-page handwritten minutes were kept, and no formal records of the "loans" to Core Ventures were ever created.

Mr. Emor extensively commingled SunRise funds with his own and diverted SunRise's assets for his personal use. It is no exaggeration to say that Mr. Emor treated SunRise's bank accounts as his own, routinely paying for purchases large and small with a debit/credit card that drew directly from those funds. He also routinely had checks and wire transfers made from SunRise to his family members and associates. Mr. Emor lived in a townhouse owned and paid for by SunRise, and purchased luxury vehicles with SunRise funds that he alone drove. When Mr. Emor sold SunRise property, in the form of a Volvo, he

deposited the $12,000 proceeds into his personal bank account. Furthermore, not only did Mr. Emor continue to receive a salary while he was incarcerated, but shortly before he went to prison he convinced the Board — his son and Ms. Negatu — to pay rent for the mother of one of his children and to award him a $500,000 bonus.

There is no evidence that SunRise functioned independently of Mr. Emor during the period of his fraud scheme. Rather, he was the dominant figure at SunRise who exerted control over all decisionmaking, using that authority and SunRise's lack of independent corporate governance to make SunRise's money and assets functionally his own. SunRise's actions unfailingly evince an understanding that Mr. Emor's interests were coextensive with those of SunRise.

Nor is there any evidence that Mr. Emor's diversion of SunRise funds for his own use was ever a secret from the individuals who served on SunRise's Board. Instead, the evidence shows that those individuals facilitated his use of SunRise funds and, in at least some instances, attempted to cover up his illicit purchases by telling SunRise's outside accountant that they were for school-related purposes. Hr'g Tr. (10/18/11 p.m.) at 12-13. Meanwhile SunRise continually invoiced the District of Columbia for reimbursement of tuition and related services for special needs students, fully knowing that Mr. Emor was using a portion of the funds for his personal gain. Ordering Mr. Emor to pay restitution to SunRise, based on its formal status as a separate legal entity, would require the Court to blind itself to the reality that for all intents and purposes, SunRise *was* Charles Emor. Adherence to the corporate structure therefore would "sanction a fraud, promote injustice, [and] lead to an evasion of legal obligations." Bufco Corp. v. N.L.R.B., 147 F.3d at 969.

### ii. Coconspirator Exception to the MVRA

There is yet another reason to deny restitution to SunRise. Although the language of the MVRA mandates, without exception in the text, that a sentencing court shall order restitution to the victim of a qualifying offense committed by the defendant, a number of courts have held that a party who participated in the defendant's offense cannot be considered a "victim" under the statute.

The Second and Ninth Circuits have recognized what some courts have called the coconspirator exception to the MVRA. In United States v. Reifler, 446 F.3d 65 (2d Cir. 2006), the Second Circuit vacated a district court's restitution order in a securities fraud case "in which coconspirators had 'pumped' the value of a stock before 'dumping' it on unsuspecting investors. When the government submitted a list of victims to the court, the list inadvertently included some of the coconspirators and their nominees in the 'pump and dump' scheme." United States v. Lazar, 770 F. Supp. 2d at 450 (citing United States v. Reifler, 446 F.3d at 127). Although no party had raised the issue on appeal, the Second Circuit held that "any order entered under the MVRA that has the effect of treating coconspirators as 'victims,' and thereby requires 'restitutionary' payments to the perpetrators of the offense of conviction, contains an error so fundamental and so adversely reflecting on the public reputation of the judicial proceedings that we may, and do, deal with it *sua sponte*." United States v. Reifler, 446 F.3d at 127. A defendant's coconspirators, the court held, are not "victims within the meaning of the MVRA," and any order granting them restitution is "beyond the authority conferred" by that statute. Id. at 132.

Similarly, in United States v. Lazarenko, 624 F.3d 1247 (9th Cir. 2010), the Ninth Circuit held that "in the absence of exceptional circumstances, a co-conspirator cannot recover restitution" under the MVRA.  Id. at 1249.  The defendant, Pavel Lazarenko, was convicted of money laundering and conspiracy to commit money laundering.  Id. at 1248.  His coconspirator, Peter Kiritchenko, "was both a victim and a participant," id. at 1250, and the district court ordered Lazarenko to pay $19 million in restitution to Kiritchenko.  Id. at 1249.  The court of appeals reversed and vacated the restitution order.  Notwithstanding the language of the MVRA, under which "co-conspirators have just as much right to restitution as do innocent victims," the court found that a literal application of this plain text would lead to "absurd results."  Id. at 1251.  The court agreed with the Second Circuit that "an order of restitution to a co-conspirator is a 'fundamental' error[.]" Id. at 1252 (quoting United States v. Reifler, 446 F.3d at 127).

In Reifler and Lazarenko, the "victims" to whom restitution was denied were formal coconspirators who were named in the government's indictment, United States v. Lazarenko, 624 F.3d at 1252, or actually prosecuted and convicted alongside the defendant, United States v. Reifler, 446 F.3d at 70.  But courts have not limited the "coconspirator exception" to the MVRA to situations in which the victim/participant was indicted by the grand jury.  In United States v. Lazar, for instance, the defendant pled guilty to wire fraud after he solicited the participation of two homeowners in a mortgage financing scheme in which he defrauded a mortgage lender.  770 F. Supp. 2d at 449.  The homeowners were not indicted or charged for their role in the transaction, id. at 450, but the court found that they clearly participated in the misrepresentations made to the lender.  Id. at 449, 451.  Citing the decisions of the Second and Ninth Circuits, the court refused to "allow[] a coconspirator to claim restitution

58

as a 'victim' under the MVRA based solely on the fortuity of the government's charging decision." Id. at 451. The court therefore held that "restitution may not be ordered under the MVRA to a conspirator who participates in a fraudulent scheme with the same criminal intent as his or her conconspirators, whether or not the conspirator is formally charged as a defendant." Id. at 452; cf. United States v. Martinez, 978 F. Supp. 1442, 1452-54 (D.N.M. 1997) (denying restitution under the MVRA to victim who obtained the funds stolen by the defendant through illegal activity).

    In applying the coconspirator exception to the MVRA, "courts have conducted fact-specific inquiries into an alleged 'victim's' willingness as a participant in the scheme and whether he or she shared the same criminal intent as the defendant from whom restitution is sought." United States v. Lazar, 770 F. Supp. 2d at 450. The relevant inquiry is whether the ostensible victim was a knowing participant in the very offense for which the defendant was ordered to pay restitution, sharing the goals of the defendant. See id. at 451 ("B.L. and R.L. were not the instigators, or the main executors of the scheme, but their intent was *in pari materia* with that of Lazar."). Ordering the defendant to pay restitution to such a "victim" would "adversely reflect[] on the public reputation of judicial proceedings." United States v. Lazarenko, 624 F.3d at 1252 (quoting United States v. Reifler, 446 F.3d at 127).[13]

    The record in this case amply supports a finding that SunRise participated in Mr. Emor's fraud. As the Court already has explained, Mr. Emor did not hide his personal

---

[13]    Neither the D.C. Circuit nor any of the judges of this Court have had occasion to consider the coconspirator exception to the MVRA. But see Scanlon v. Greenberg Traurig, LLP, 778 F. Supp. 2d 56, 59 (D.D.C. 2011) (noting "the limited exception recognized by some courts to mandatory restitution under § 3663A").

exploitation of SunRise funds from the staff who answered to him or from the members of SunRise's Board. Indeed, those individuals often facilitated his theft of funds, whether through writing checks and wiring money, approving payments to benefit Mr. Emor's family, rubber-stamping the purported loans to Core Ventures, or authorizing a $500,000 "bonus" to Mr. Emor just before he was to report to prison after his appeals were exhausted in his prior criminal case. To the limited extent that SunRise as an institution could be said to have had any independence from Mr. Emor, therefore, it fully sanctioned and participated in his fraudulent diversion of government-derived funds for his own benefit. For this reason, the Court does not consider it to be a victim entitled to restitution under the MVRA.

### b. District of Columbia and Federal Government

The government argues that because all of SunRise's funds came from the District of Columbia and the federal government, which paid those funds to SunRise as reimbursement for the provision of educational and related services, the District of Columbia and the federal government are ultimately victims of Mr. Emor's fraudulent use of the funds for personal, non-educational purposes. Government's Supplemental Memorandum of Law ("Gov. Br.") [Dkt. No. 91] at 11-12.[14]

---

[14] SunRise did not receive any funds directly from the federal government. Instead, as explained above, the federal government reimbursed the District of Columbia for the expenses it paid to SunRise for Medicaid-eligible related services. See Indictment ¶¶ 9-11. During the evidentiary hearing, the government did not present evidence regarding the specific dollar amounts provided to the District of Columbia by the federal government to cover the Medicaid-related services of SunRise Academy students. In response to the Court's inquiry about the apportionment of any restitution award between the District of Columbia and federal governments, the government represented that pursuant to 42 C.F.R. § 433.300 *et seq.*, the District of Columbia may be required to refund the federal share of any Medicaid funds that it recovers based upon fraud or abuse. Accordingly, the government requested that all restitution

Mr. Emor counters that under the terms of SunRise's fixed-price contract with the District of Columbia, the school was reimbursed on a flat, per-student basis for services it had already provided; if SunRise could provide those services while spending less than the total billed amount, the government has no claim to the surplus, absent charges of fraudulent billing, which the government has not pursued in this case. Emor Br. at 32-33. Highlighting the government's admission that "there are no specific provisions in any contract, regulation or statute prohibiting a school employee or school administrator from using funds for their personal benefit," nor any "specific provisions that delineate how a nonprofit school should specifically spend the government funds it receives," Government's Supplemental Sentencing Memorandum [Dkt. No. 55] at 5 n.1, Mr. Emor argues that "any profit or surplus" that accrued to SunRise belongs to the school. Emor Br. at 32; see id. at 24 (maintaining that "if any entity were defrauded" by the transfers to Core Ventures, "that entity must be Sunrise").

At the outset it should be said that any discussion of a "surplus" of funds is a red herring. This includes Mr. Emor's disquisition on the law of fixed-price contracts and his observation that contractors by necessity are often compelled to run a surplus as a hedge against future reductions in income. See Emor Br. at 33-34 ("[T]he contractor bears the risk of loss or gain, and must live with the consequences. . . . Sunrise took the risk of performing its fixed-price contract with DCPS, and the proceeds, as well as the losses, from those contracts belong to

be ordered to the District of Columbia, and stated that "if restitution is ordered to the District of Columbia based upon payment of tuition and related services provided to SunRise Academy, the District of Columbia and the federal government will determine the application of 42 C.F.R. § 433.300 et seq., and any amount of the reimbursable federal share of recovered Medicaid funds and provide it to the federal government through the Center for Medicare and Medicaid Services ('CMS') at the Department of Health and Human Services ('HHS')." Government's Response to Court's March 14, 2012 Order [Dkt. No. 107] at 2-3.

Sunrise.").  The funds at issue in this case do not constitute a surplus: they are funds that were squandered by Mr. Emor on personal purchases or, in the case of the Core Ventures transfers, removed from SunRise's control and put exclusively within Mr. Emor's power.  The legitimacy of an OSSE-funded school running a surplus is not the issue.

Mr. Emor's argument, however, reaches more broadly than the maintenance of a surplus: he argues that as long as SunRise was providing an adequate education to the students for which it was billing the District of Columbia, it could do whatever it wanted with any extra money.  Emor Br. at 2 n.3 (stating that there is "no law to support [the government's] position that all the funds should have been used for the students").  At the very least, Mr. Emor contends, the extra funds could be "used in any way consistent with Sunrise's charitable purposes."  Id. at 32.  The latter proposition is not germane, because the Court has concluded that neither Mr. Emor's use of SunRise funds to purchase personal items, nor the transfer of funds to Core Ventures, were actions legitimately taken in furtherance of SunRise's educational mission.  Thus, Mr. Emor is left with his more fundamental argument that because no law or regulation was violated by SunRise's provision of money to Mr. Emor and to Core Ventures, it could not have been fraudulent for Mr. Emor to instigate that provision.

The mere fact that Mr. Emor's diversion of SunRise funds may not have violated any D.C. law or regulation does not mean that his actions were not fraudulent vis-à-vis the District of Columbia and the federal government.  "[I]t is settled that wire fraud does not require proof that the defendant's conduct violated a separate law or regulation, be it federal or state law."  United States v. Green, 592 F.3d 1057, 1064 (9th Cir. 2010); accord United States v. Baum, 555 F.3d 1129 (10th Cir. 2009); United States v. Frost, 321 F.3d 738, 741 (8th Cir. 2003);

United States v. Scallion, 533 F.2d 903, 910 (5th Cir. 1976); United States v. Bush, 522 F.2d 641, 646 n. 6 (7th Cir. 1975) (addressing mail fraud). A defendant's conduct "need not otherwise be illegal in the sense that the government must also prove that the defendant's conduct violated a specific statute or regulation." United States v. Green, 592 F.3d at 1064. Rather, "[t]he scheme to defraud must only include an 'affirmative, material misrepresentation.'" Id.; cf. United States v. Tann, 532 F.3d at 872 (stating that wire fraud requires only that a defendant "knowingly and willingly entered into a scheme to defraud" and that "an interstate wire communication was used to further the scheme").

The "legality" of SunRise's expenditures under D.C. laws and regulations therefore does not settle the issue. The question is whether Mr. Emor's fraudulent misrepresentations harmed the government. It is not necessary that Mr. Emor intended to victimize the District of Columbia or the federal government. Under the MVRA, a "victim" of a scheme, conspiracy, or pattern of criminal behavior is defined as "any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663A(a)(2). Thus, for instance, where third parties were injured in a car crash caused by a defendant as he fled the police, they have been regarded as victims of the conspiracy to which the defendant pled guilty. United States v. Gutierrez-Avascal, 542 F.3d 495, 498 (5th Cir. 2008) (construing identical language of VWPA).

Although the District of Columbia paid SunRise every month for each student to whom SunRise had *already* provided educational services, the question is whether the District of Columbia was directly harmed by Mr. Emor's diversion of SunRise funds to his own benefit. The Court concludes that it was. There is no dispute that the only purpose for which the

government reimbursed SunRise was to educate special needs students in the District of Columbia. The ultimate effect of Mr. Emor's scheme was that the government provided these funds to SunRise each month under the belief that it was paying the school for educational and related services rendered the previous month. Instead, much of the money was being used to line Mr. Emor's pockets and to benefit his family members and associates. Notwithstanding the reimbursement mechanism at work here, this is precisely the type of scheme that has been recognized as violating the wire fraud statute.

In <u>United States v. Green</u>, for example, the defendant collaborated with various public schools to exploit loopholes in a federal subsidy program known as the E-Rate program. Her assistance enabled these schools to obtain inflated funding premised on misrepresentations to the agency in charge of the program, but her actions were not prohibited by any rules or regulations governing the E-Rate program at the time of her offense. 592 F.3d at 1060-63. Although the defendant had not violated any rules or regulations, the Ninth Circuit affirmed her wire fraud convictions because the omissions and misrepresentations of her scheme "led [the agency] to believe it was funding something other than what it was actually funding." <u>Id</u>. at 1067.

Similarly, in <u>United States v. Baum</u>, the defendant defrauded mortgage lenders through a complex scheme in which he secured loans at inflated purchase prices; the upshot of his scheme was that lenders unwittingly extended loans in amounts higher than the true purchase price of the homes, with the difference being used by the home buyers for remodeling (and to pay the defendant). 555 F.3d at 1130. "The fraud," explained the court in affirming the defendant's wire fraud conviction, "was that the mortgage lender was led to believe that it was lending

money to purchase a home for $X, not to purchase a home for $X–Y and then undertake $Y worth of remodeling or repairs." Id. at 1132.  And representatives of each lender testified that the loans would not have been approved had they known the true facts.  Id.

A case with some similarities to this one, United States v. Ormsby, 225 Fed. Appx. 383 (6th Cir. 2007), involved a defendant who was the director of a school for special needs children from low-income families.  She solicited charitable donations in the form of checks for the school and for a parents' organization that purportedly would use the donations to benefit the school; instead of directing the money to its stated purpose, however, the defendant converted the vast majority of the $130,000 in checks that she obtained to cash.  Id. at 384.  Upholding the defendant's mail fraud conviction, the Sixth Circuit held that it was irrelevant that the evidence did not show what she did with the proceeds; the proper question instead was "what she did not do: give the money to Meeter School."  Id. at 386.  "Once the government showed that Ormsby acquired the money under false pretenses — by claiming she would give the money to Meeter school — it had no obligation to show anything more than that Ormsby never gave the money to the school."  Id.

Mr. Emor's misrepresentations to DCPS and OSSE may have been less direct than those in the cases just discussed, because instead of requesting money for a stated purpose in advance, consistent with the billing procedure established by DCPS and OSSE he caused SunRise to bill the government after educational and related services had been provided.  But this practice led to the same result: the District of Columbia made monthly payments to SunRise under the understanding that these payments were for the provision of education to SunRise's students.  The District of Columbia did not know that some of these funds were being spent on a

luxury Mercedes or expensive watches, or to pay the rent of Mr. Emor's family members, or to fund a for-profit corporation owned exclusively by Mr. Emor. The defendant "concealed material facts from the [District of Columbia] in an attempt to induce it to [pay SunRise for educational services]. That, standing alone, is fraud." United States v. Green, 592 F.3d at 1066. Mr. Emor's conduct led the District of Columbia "to believe it was funding something other than what it was actually funding." Id. at 1067. Consequently, the District of Columbia and the federal government, which funded SunRise on the understanding that they were reimbursing the school for educational services, were victimized by Mr. Emor's diversion of that money for his private gain.[15]

   Furthermore, although not essential to the outcome, SunRise's status as a nonprofit should not be overlooked in assessing how the government believed its payments were being used. SunRise's Articles of Incorporation, filed with the District of Columbia, state that it "is organized exclusively for educational purposes" and provide that its sole purpose is "to serve the special needs of students diagnosed as having learning and emotional deficits or disabilities, and needing special education services in the District of Columbia from ages six to twenty-one." Def. Ex. 3. In keeping with its nonprofit status, SunRise's Articles further state that "[n]o part of the net earnings of the corporation shall inure to the benefit of, or be distributable to its members,

---

[15] Both sides have tried to draw the Court into forming an assessment about the quality of the education provided to students at SunRise. The evidence presented on that question is mixed, and the Court is not in a position to make any determination about whether SunRise was providing an adequate education to its students during the years encompassing Mr. Emor's fraud scheme. Nor does the Court need to make such a determination. The question is not whether Mr. Emor's diversion of funds caused SunRise's programs to fall below a particular level of quality. The relevant question is whether the government was harmed by Mr. Emor's fraud by being led to believe that its funds were being spent on something other than what they were in truth being spent on.

trustees, directors, officers, or other private persons," except that the corporation is authorized

"to pay reasonable compensation for services rendered and to make payments and distributions in

furtherance of Section 501(c)(3) purposes." Id. Where such an entity bills the government each

month for reimbursement of the costs of educational services, the government has even more

reason to believe that the funds it is providing are not being used to personally enrich individuals

associated with the school.[16]

In sum, the Court concludes that the nature of SunRise's agreements with the

District of Columbia — under which the school billed for services already rendered rather than

charge in advance — fails to mitigate the fraud inherent in Mr. Emor's actions. The District of

Columbia paid SunRise *only* to reimburse it for the provision of educational and related services.

---

[16]     Mr. Emor cites D.C. Code § 29-403.02, which provides that every nonprofit
corporation shall have "the same powers as an individual to do all things necessary or convenient
to carry out its affairs," including the power to "[l]end money, invest and reinvest its funds" and
to "do any other act, not inconsistent with law, that furthers the purposes, activities, and affairs of
the corporation." Id.§ 29-403.02(8), 29-403.02(17). Emor Br. at 32. This provision is unhelpful
to him for several reasons. First, the issue here is not what nonprofits generally may do with
their money, which can come from a variety of sources, but rather what SunRise implicitly led
the government to believe it was using its reimbursement funds for. Even aside from this, Mr.
Emor neglects to mention that the authority to lend or invest money granted by the subsection he
cites is expressly limited by D.C. Code § 29-406.32, which states: "A nonprofit corporation shall
not lend money to or guarantee the obligation of a director or officer of the corporation."
Moreover, *all* of the powers enumerated in the Section cited by Mr. Emor are limited to "things
necessary or convenient to carry out its affairs." The significance of this point is not that
SunRise has violated D.C. law on nonprofits — a showing that, again, is unnecessary to prove
wire fraud — but rather to further illustrate why it was fraudulent for a nonprofit like SunRise to
bill the government for educational services and then disperse the money for the benefit of
private individuals. The common-sense expectation that something like this should not occur
was expressed by the OSSE representative who testified at the evidentiary hearing, Dr. Amy
Maisterra, who agreed that she "wouldn't expect" a nonprofit school that receives its funding
exclusively from the District of Columbia through the reimbursement program to earn any type
of profit because "under the auspices of a nonprofit you wouldn't expect to see a significant
profit margin." Hr'g Tr. (10/13/11 p.m.) at 70.

Mr. Emor's covert diversion of that money for his private benefit directly harmed the District of Columbia, which provided the funds, and indirectly harmed the federal government, which reimbursed the District of Columbia for a portion of those funds. Thus, the District of Columbia and the federal government are both victims of Mr. Emor's offense within the meaning of the MVRA. Because the Court has concluded that SunRise is not entitled to receive restitution, it will order that restitution be paid to the District of Columbia, which in turn may be required to reimburse the federal government for that portion of the funds paid to SunRise that originated with the federal government. See supra at 60-61, note 14.

## C. Forfeiture

Mr. Emor's plea agreement provided that at sentencing the government would seek forfeiture of the $2,035,307.27 seized from the Core Ventures bank accounts and the 2006 Lexus purchased with funds from those bank accounts, and that it would also seek imposition of a money judgment in the amount of $2,470,000, representing the full amount of the proceeds traceable to Mr. Emor's wire fraud scheme. Plea Agr. ¶ 11. The government acknowledged that Mr. Emor would argue "that the seized assets are not derived from any wire fraud scheme and are not properly the subject of forfeiture." Id. The United States now submits that the full amount of the proceeds traceable to Mr. Emor's fraud scheme exceeds $2,358,000, which includes the funds transferred to Core Ventures. Mr. Emor contends that the fraud scheme to which he has pled guilty does not encompass the Core Ventures transactions. As discussed earlier, the Court agrees with the government, finding that the Core Ventures transactions were part of Mr. Emor's fraud

scheme and therefore constitute proceeds of his offense.[17]

In contrast to restitution, which is designed to compensate the victim for its loss, the purpose of forfeiture is to punish the defendant by forcing him to disgorge the proceeds of his criminal activity.  United States v. Browne, 505 F.3d at 1281; see United States v. McGinty, 610 F.3d at 1248 ("'Payment of restitution in no way alters the status of the property as ill-gotten gains.  Restitution operates to make the victim of the crime whole, not to confer legal ownership on the offender of the stolen property.'") (quoting United States v. Taylor, 582 F.3d 558, 566 (5th Cir. 2009)).  Although defendants in some cases must pay both restitution and criminal forfeiture, "that result is not impermissible 'double recovery.'"  United States v. Newman, 659 F.3d 1235, 1241 (9th Cir. 2011); see id. (agreeing that district court could not equitably reduce forfeiture amount owed by defendant in light of amount he also was required to pay back in restitution).  Because of the distinct purposes served by restitution and forfeiture, and the mandatory language found within their respective statutory schemes, courts do not offset one based on the other.  United States v. Taylor, 582 F.3d at 565-67.  Indeed, courts lack the authority to do so.  United States v. Newman, 659 F.3d at 1241; United States v. Alalade, 204 F.3d 536, 540-41 (4th Cir. 2000) (holding that court lacks discretion under the MVRA to reduce restitution by an amount equal to the value of the property forfeited to the government).

Although the Court may not order restitution to be paid out of forfeited assets, victims may petition the Department of Justice for remission of forfeited assets, and the Attorney

---

[17]    The Court's Preliminary Order of Forfeiture, entered on November 10, 2011, did not specify the amount of the money judgment — only that it would be at least $30,000 — or the specific property subject to forfeiture.  See Preliminary Order of Forfeiture (Nov. 10, 2011) [Dkt. No. 72].

General's designee can transfer forfeited assets to victims to satisfy or partially satisfy a restitution order. See 18 U.S.C. § 981(d), (e)(6); 18 U.S.C. § 982(b)(1); 21 U.S.C. § 853(I); 28 C.F.R. § 9.1 *et seq*.; United States v. Alalade, 204 F.3d at 538 & n.2. The government has informed the Court that the United States Attorney's Office for the District of Columbia routinely makes recommendations to the Attorney General's designee for restoration of forfeited assets to victims named in a restitution order in cases that meet the Code of Federal Regulations remission and mitigation guidelines. Gov. Br. at 40. The government has agreed to make such a recommendation in this case. Plea Agr. ¶ 11 ("The United States Attorney's Office agrees to make a non-binding recommendation to the Asset Forfeiture and Money Laundering Section at the Department of Justice that any monies obtained from the defendant through forfeiture be distributed to the victims of the offense in accordance with any restitution order entered in this case.").

Criminal forfeiture is mandatory in all cases where it applies, United States v. Monsanto, 491 U.S. 600, 607 (1989), and operates *in personam* against a defendant to divest him of his title to proceeds of crime or property involved in his crime or that facilitated his unlawful conduct, United States v. Vampire Nation, 451 F.3d 189, 202 (3d Cir. 2006). Forfeiture may be entered for the full amount of the defendant's criminal proceeds and is not limited to those assets in the defendant's possession at the time forfeiture is ordered. United States v. Day, 524 F.3d 1361, 1377-78 (D.C. Cir. 2008); United States v. Vampire Nation, 451 F.3d at 202; see 21 U.S.C. § 853.

For certain forms of wire fraud, such as those that affect a financial institution, forfeiture is mandated by 18 U.S.C. § 982(a), but it also is required for all other wire fraud

convictions by virtue of 28 U.S.C. § 2461(c).  Section 2461 provides that if a defendant is convicted of a criminal violation for which civil or criminal forfeiture is authorized, "the court shall order the forfeiture of the property as part of the sentence in the criminal case pursuant to the Federal Rules of Criminal Procedure and section 3554 of title 18, United States Code."  28 U.S.C. § 2461(c).  Section 981 of Title 18 defines which property is subject to forfeiture, and includes "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to," *inter alia*, any offense constituting "specified unlawful activity" as defined in 18 U.S.C. § 1956(c)(7).  See 18 U.S.C. § 981(a)(1)(C).  "Specified unlawful activity" is defined in Section 1956(c)(7)(A) to include "any act or activity constituting an offense listed in Section 1961(1) of this title," one of which is wire fraud under 18 U.S.C. § 1343.  See United States v. Vampire Nation, 451 F.3d at 198 (holding that forfeiture for general mail fraud convictions is authorized via 28 U.S.C. § 2461(c) notwithstanding that only certain types of mail fraud require forfeiture under 18 U.S.C. § 982(a)).  In effect, Section 2461(c) is a "'bridge' or 'gap-filler' between civil and criminal forfeiture, in that it permits criminal forfeiture when no criminal forfeiture provision applies to the crime charged against a particular defendant but civil forfeiture for that charged crime is nonetheless authorized."  Id. at 199; accord United States v. Day, 524 F.3d at 1376.

When a court determines that property is subject to forfeiture under the applicable statute, it has the option of ordering forfeiture in the form of a money judgment corresponding to the amount of the defendant's proceeds from his offense.  United States v. Day, 524 F.3d at 1377-78; United States v. Darui, 549 F. Supp. 2d 111, 114 (D.D.C. 2008); see FED. R. CRIM. P. 32.2.  This is true even when the defendant is unable to satisfy the judgment at the time he is sentenced.  United States v. Vampire Nation, 451 F.3d at 202-03; see United States v. Day, 524

F.3d at 137 ("'[T]he government need not prove that the defendant actually has the forfeited proceeds in his possession at the time of conviction.'") (quoting <u>United States v. Hall</u>, 434 F.3d 42, 59 (1st Cir. 2006)).

Rule 32.2 of the Federal Rules of Criminal Procedures governs criminal forfeiture and provides that "if the government seeks forfeiture of specific property, the court must determine whether the government has established the requisite nexus between the property and the offense." FED. R. CRIM. P. 32.2(b)(1)(A). Likewise, if the government "seeks a personal money judgment, the court must determine the amount of money that the defendant will be ordered to pay." <u>Id</u>.

As noted above, "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to" a wire fraud offense is subject to criminal forfeiture. 18 U.S.C. § 981(a)(1)(C). In cases like this one that involve "unlawful activities" under Section 981, "the term 'proceeds' means property of any kind obtained directly or indirectly, as a result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense." <u>Id</u>. § 981(a)(2)(A).

Funds obtained through a fraudulent scheme become "proceeds" of the fraud regardless of whether the defendant has yet received the benefit of the funds. "The fraudulent scheme produces proceeds at the latest when the scheme succeeds in disgorging the funds from the victim and placing them into the control of the perpetrators." <u>United States v. Allen</u>, 76 F.3d 1348, 1361 (5th Cir. 1996); <u>see</u> <u>United States v. Morelli</u>, 169 F.3d 798, 805 (3d Cir. 1999) (finding that unlawfully diverted tax money constituted proceeds of fraud as soon as it was brought within the control of the defendant).

When a defendant has engaged in a mail or wire fraud scheme, forfeiture is not limited to the proceeds gained through the particular mailing or wire transaction on which the conviction was based; rather, it "extends to the entire scheme" of which the mailing or wire transaction was a part. United States v. Venturella, 585 F.3d 1013, 1015 (7th Cir. 2009); see id. ("The mail fraud count that the defendants were convicted of . . . alleged a broader scheme to defraud numerous government agencies of hundreds of thousands of dollars."). "Where the conviction . . . is for executing a scheme, engaging in a conspiracy, or conducting a racketeering enterprise, the government need only establish that the forfeited assets have the 'requisite nexus,' FED. R. CRIM. P. 32.2(b)(1), to that scheme, conspiracy, or enterprise." United States v. Capoccia, 503 F.3d 103, 117-18 (2d Cir. 2007) (Sotomayor, J.).

In determining whether the "requisite nexus between the property and the offense" has been demonstrated, the Court is required to make its determination "without regard to any third party's interest in the property." FED. R. CRIM. P. 32.2(b)(2)(A). See United States v. Cox, 575 F.3d 352, 358 (4th Cir. 2009) ("Rule 32.2 requires the issuance of a preliminary order of forfeiture when the proper nexus is shown, whether or not a third party claims an interest in the property.").

For reasons that should be clear from the Court's findings of fact, the Court concludes that the transfers of funds to Core Ventures were part and parcel of Mr. Emor's scheme "to fraudulently obtain money, from SunRise's bank accounts, for his own use and benefit," Sup. Inf. at 3, and that the government has demonstrated the requisite nexus between the seized properties and Mr. Emor's fraud.

Taking a narrow view of the offense to which he pleaded guilty, Mr. Emor argues that "[t]he scheme to which Mr. Emor admitted largely involved purchases of personal items for Mr. Emor's use," and that "[t]he common thread among the transactions Mr. Emor admitted, with the single exception of the Volvo sale, was his misrepresentation that he purchased materials and supplies for the benefit of Sunrise." Emor Br. at 29-30. He argues that because there are "material distinctions" between the conduct described in the count of conviction and the transactions surrounding Core Ventures, which generated the assets the government seeks to forfeit, the government has not shown the requisite nexus justifying forfeiture. Id. at 29 (quoting United States v. Black, 526 F. Supp. 2d 870, 883 (N.D. Ill. 2007)).

In the Court's view, however, the evidence demonstrates that while the Core Ventures transactions involved a different method than Mr. Emor's other fraudulent conduct, they were a continuation of the same scheme to obtain SunRise money for his own benefit. As the government has emphasized, at the time Mr. Emor formed Core Ventures he had reason to believe that he would be incarcerated and/or deported as a result of his prior conviction, which was then on appeal. Moving SunRise funds into a separate entity over which he held exclusive control ensured continued access to these funds in the event that he lost signatory authority over SunRise's accounts. Moreover, adding an additional layer of ownership had the effect of obscuring any present expenditure of SunRise funds for Mr. Emor's own benefit.

That the Core Ventures transactions were a continuation of Mr. Emor's same fraudulent conduct is best illustrated by the first thing he did with those funds: shortly after the opening of Core Ventures' first bank account, he purchased an expensive Lexus. Instead of

directly procuring this vehicle with funds from SunRise's bank account, as he had previously done when buying other luxury vehicles, Mr. Emor directed that $37,000 be transferred from SunRise to Core Ventures specifically for this purpose. Some evidence suggests that making the purchase with Core Ventures' funds, rather than with those of SunRise, made it even easier for Mr. Emor to disguise the nature of the purchase. Mr. Louis Leibowitz had initially been asked to prepare a general ledger for Core Ventures, as he routinely did for SunRise. In doing so, he noted the $35,845 payment that was made for the Lexus and inquired about the purpose of that payment. At some point afterward he was told not to do any further work on Core Ventures — although Mr. Leibowitz could not say whether there was a cause-and-effect relationship between these two incidents. See Hr'g Tr. (10/18/11 p.m.) at 39-40. Undoubtedly, the transfer of over $2 million to Core Ventures — without any contract, loan agreement, or other documentation requiring the company to return the money — had the effect of placing SunRise funds in Mr. Emor's hands, and his purchase of the Lexus illustrates that his motive for ensuring the continued availability of these funds was to use them for his own benefit.

The Court therefore concludes that the funds seized from Core Ventures' bank accounts and the 2006 Lexus registered to Core Ventures are properly subject to forfeiture.

## V. CONCLUSION

For all of these reasons, the Court concludes that the defendant must pay restitution to the District of Columbia in the amount of $2,358,536.40, that a money judgment in the amount of $2,358,536.40 will be entered against Mr. Emor under the forfeiture statutes, and that the following specific property is forfeited to the United States: (a) $1,810,165.29 seized

from BB&T Bank account number #xxxxx9526, held in the name of Core Ventures;

(b) $225,141.98 seized from BB&T Bank account number #xxxxx3943, held in the name of Core

Ventures; and  (c) a 2006 Lexus LX470, VIN: JTJHT00W264011238, registered to Core

Ventures.  A separate Order to this effect, consistent with the foregoing Opinion, will be issued

this same day.  In addition, the Court has issued a Final Order of Forfeiture and an Amended

Judgment, both dated today.

SO ORDERED.


_/s/_____
PAUL L. FRIEDMAN
United States District Judge

DATE:  March 23, 2012